UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------x
JOSEPH P. LASALA and                        :
FRED S. ZEIDMAN, as CO-TRUSTEES of
the AREMISSOFT CORPORATION                  :
LIQUIDATING TRUST,
                                            :
                    Plaintiff,
                                            :
        -against-
                                            :
LLOYDS TSB BANK, PLC,
                                            :
                    Defendant.
-----------------------------------------------------x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 08-15-07
```

06 Civ. 4335 (CSH)

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior United States District Judge:

In this diversity action, plaintiffs seek to hold defendant Lloyds TSB Bank, PLC ("Lloyds"

or "the Bank") responsible for its alleged role in connection with a massive "pump and dump"

scheme perpetrated by two corporate insiders of a software company, who fraudulently inflated

the company's value and then sold their shares and funneled these funds through banks in

Switzerland and elsewhere. In this motion defendant seeks to dismiss the complaint on three

separate grounds: (1) *forum non conveniens*; (2) preemption of the claims by the Securities

Litigation Uniform Standards Act, 15 U.S.C. §§ 77, 78 ("SLUSA"); and (3) failure to state a claim

upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6). For the following reasons,

I dismiss the complaint on the ground of *forum non conveniens*.

## I. BACKGROUND

### A.      The Scheme Perpetrated by Kyprianou and Poyiadjis

Much of the following account is drawn from the complaint, whose well-pleaded factual

allegations are taken as true on this motion. AremisSoft Corporation ("AremisSoft" or "the

Company") was a software company, incorporated in Delaware in 1997, that purported to develop,

market, implement, and support software applications for mid-sized corporations in the manufacturing, healthcare, hospitality and construction industries. Decl. Joseph P. LaSala in Opp'n to Def.'s Mot., dated Sept. 21, 2006 ("LaSala Decl."), at ¶ 9. From about 1998 through July of 2001, Lycourgos Kyprianou and Roys Poyiadjis, two Cypriots who were officers of the Company, ¹ caused the Company to issue false public statements and regulatory filings representing to the public that it was experiencing rapid growth when in fact its growth nowhere neared the stated revenues. Compl. ¶¶ 18, 19. The two men caused AremisSoft to announce publicly that it had acquired other software companies of significant value, when, in reality, the companies were small and had been acquired for much less than the announced price. They fabricated records in support of these falsehoods. *Id.* The effect of these fraudulent misrepresentations was that the value and profitability of the Company were perceived to be much greater than they actually were, and consequently the price at which the Company's shares were traded on the open market was artificially high. Kyprianou and Poyiadjis sold their shares at these inflated prices to investors who were not privy to their knowledge concerning the true value of the Company. LaSala Decl. ¶ 11. In order to give the impression that the stock sales were arm's length sales by other investors, Kyprianou and Poyiadjis devised a money laundering scheme, employing various entities to hold and sell their AremisSoft stock. *Id.* Kyprianou allegedly breached his fiduciary duties in other ways, by converting assets purportedly used to acquire software companies for his own personal benefit, and failing to account to AremisSoft for his insider trading profits. *Id.* When the truth about the Company was revealed, the value of the stock plummeted, and investors suffered great losses. By the time the fraud was uncovered in 2001,

---

¹ Kyprianou was AremisSoft's founder and largest individual shareholder, and he served as Chairman of the Board of Directors from October 1997, Chief Executive Officer from October 1997 to May 2000, and Co-CEO with Poyiadjis from February 2001 to July 31, 2001. Compl. ¶ 16.

AremisSoft shareholders had sustained losses of approximately $500 million. Compl. ¶ 30.

By May 2001 attention began to be focused on AremisSoft for reporting inflated income. On May 17, the *New York Times* reported that the true value of an AremisSoft contract with the Bulgarian government was not the $37.5 million claimed by the Company but rather less than $4 million. *Id.* ¶ 20. By May 24, 2001, at least one class action lawsuit against AremisSoft and its directors had been filed. *Id.* ¶ 21. On July 31, 2001, the day after AremisSoft was due to release its second quarter 2001 earnings, the Company announced that Kyprianou had resigned and that it was delaying the earnings release. On July 31, 2001, the Company was delisted from NASDAQ. *Id.* ¶¶ 23, 24. On or about October 4, 2001, the SEC sued Kyprianou and Poyiadijs in a civil injunction action, alleging that they had sold millions of shares of their AremisSoft stock in violation of U.S. securities laws. *Id.* ¶ 25. In an action before this Court, the SEC succeeded in freezing $175 million of Poyiadjis's proceeds lodged in bank accounts in the Isle of Man. In December 2001, an indictment was obtained against Poyiadjis in the Southern District of New York, and in June 2002, a superseding indictment was returned against Kyprianou, Poyiadjis, and M.C. Mathews, the top AremisSoft executive in India, on counts of securities fraud and money laundering, and conspiracy to commit both crimes. *Id.* ¶¶ 26, 28, 29. On March 15, 2002, AremisSoft filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code. *Id.* ¶ 27.

## B.   The Parties

Neither of the swindlers, whose acts of fraud and theft are undisputed, is a party to this case. Kyprianou is in Cyprus, and Poyiadjis is awaiting sentencing in this Court, having pleaded guilty to fraud. *See United States v. Poyiadjis, et al.*, 01 Cr. 1177, 2002 WL 1941481 (S.D.N.Y. Aug. 21, 2002). Defendant Lloyds is a wholly owned subsidiary bank of Lloyds TSB Group, PLC, both of which have principal places of business in London, United Kingdom. Lloyds maintains extensive

branches throughout the world, including in Geneva, Switzerland, and New York, NY. Compl. ¶¶ 10, 11.

Plaintiffs are co-trustees of the AremisSoft Corporation Liquidating Trust (the "Trust"), a Delaware trust formed pursuant to three orders by District Judge Pisano of the District of New Jersey in connection with AremisSoft's voluntary bankruptcy: (1) a July 2002 order confirming the First Amended Joint Plan of Reorganization of AremisSoft ("Plan of Reorganization"); (2) an August 2002 order approving a Class Action Settlement, which had settled a consolidated class action brought by former shareholders against AremisSoft; and (3) an August 2002 order correcting the Order and Final Judgment previously entered in respect of AremisSoft's Chapter 11 bankruptcy petition. *Id.* ¶ 2. The governing documents for the Trust are the Plan of Reorganization and the Liquidating Trust Agreement ("Trust Agreement").

This action seeks to pursue some of the claims assigned to the Trust. Under the Plan of Reorganization, the Trust was assigned claims arising out of the purchase of AremisSoft securities on the open market between April 22, 1999 and July 27, 2001 as well as corporate claims of AremisSoft. *Id.* ¶ 5. The Trust beneficiaries include SoftBrands, Inc. as the reorganized debtor and the former AremisSoft shareholders, who number over 6000 persons. *Id.* ¶¶ 6, 30.

The Trust has litigated Trust Claims abroad. It commenced a chancery action in the Isle of Man against Kyprianou, Poyiadjis, and others. *Id.* ¶ 31. Kyprianou defaulted in appearance in this proceeding, and consequently the Trust initiated separate proceedings against him and alleged co-conspirators in Cyprus in July of 2005. *Id.* ¶ 35. Plaintiffs also initiated proceedings in the United Kingdom to freeze assets belonging to Kyprianou and his wife and to obtain relevant documents and information from third parties. *Id.* ¶ 36. Plaintiffs maintain that it was through these last proceedings that they obtained documents giving rise to their claims in the instant action. *Id.* ¶¶ 37, 38.

4

C.   **The Allegations Against the Bank**

This case, along with the related cases filed by the plaintiff Trustees against UBS, AG

("UBS") and the Bank of Cyprus Public Company Limited ("Bank of Cyprus"),[2] turns on the role

of a bank in facilitating the fraud and/or the money laundering of one or both of the swindlers and

their co-conspirators.  In the captioned case against Lloyds, Kypriannou is the central villain.  The

gravamen of the complaint is that "Lloyds not only made it possible, and in many instances easy,

for Kyprianou to launder the proceeds of his criminal and fraudulent conduct through Lloyds'

accounts, but Lloyds misrepresented material information that it knew would be relied on by

AremisSoft and its auditors in reporting the Company's financial condition and thereby

perpetuated Kyprianou's fraud and crimes upon the Company." *Id.* ¶ 60.

Kyprianou would use nominee companies, primarily AremisSoft's subsidiaries

AresmisSoft EE.ME.A. and LK Global, to hold and sell his AremisSoft stock.  The complaint

alleges that Lloyds played an integral role in this scheme.  Kyprianou opened an account at Lloyds

through Evangelos Embedoklis, his wife's cousin, who was at the time the Deputy General

Manager and Chief of Private Banking of Lloyds.  *Id.* ¶¶ 18, 49.  Lloyds assigned Jane Moore-

Piacentini, Manager at the Geneva branch of Lloyds, to be Kyprianou's account manager.  *Id.* ¶ 49.

Plaintiffs allege that at least one account was unquestionably opened for the benefit of Kyprianou

and that several others were likely to have been opened for his benefit as well.  *Id.*  Kyprianou and

Lloyds allegedly agreed that money transferred into the Lloyds-Kyprianou account would be

transferred without reference to the remitter's name and directed to Moore-Piacentini.  *Id.*  It is

---

[2] Pursuant to Local Civil Rule 1.6 governing the procedure for an attorney's request that a case be accepted as related to a case pending before a particular judge, this Court has accepted *LaSala & Zeidman v. UBS AG*, 06 Civ. 1736 (CSH), and *LaSala & Zeidman v. Bank of Cyprus Public Company Limited*, 06 Civ. 6673 (CSH) as related to the case at bar.  All defendants in all three cases have moved on similar grounds to dismiss the complaints.  The Court's opinions deciding these three motions are being filed concurrently.

alleged that Lloyds not only sanctioned but "itself suggested" the use of pseudonyms to conceal Kyprianou's ownership and control over the accounts. *See* LaSala Decl. ¶ 43. Furthermore, money was allegedly transferred into that account with reference to "house account" numbers, numbers that are created by a bank for its internal use. Compl. ¶¶ 34, 50, 82. At the time the Lloyds-Kyprianou account was opened, Lloyds is alleged to have known that Kyprianou was Chairman of AremisSoft, a publicly traded United States Company, and that the purpose of the account was depositing the proceeds of the sale of his shares. *Id.* ¶ 51.

Lloyds is also charged in the complaint with knowledge, actual or constructive, that Kyprianou held AremisSoft stock and received stock options, and that Kyprianou had in November 2000 gifted 1.6 million shares to two unnamed donees. *Id.* ¶ 53. In December 2000, shortly after those "gifts" were made, more than $36 million was transferred into the Lloyds-Kyprianou account in four tranches from two accounts at Bordier et Cie ("Bordier") and Dominick Company AG ("Dominick"), two private Swiss banks. *Id.* ¶ 54. On January 3, 2001 and February 9, 2001, Lloyds received transfers of $7,500,00 and $781,536 from an account at Bordier in a different name. *Id.* ¶ 55. These were proceeds of the sale of stock after exercise of AremisSoft options that Kyprianou had gifted through another alter ego entity. *Id.* All together, Kyprianou is alleged to have laundered more than $44 million in furtherance of this scheme. *Id.* ¶¶ 19, 58. It is alleged that Lloyds' failure to take measures to clarify the identity of the beneficial owner on the account and its permissive practices with respect to the Lloyds-Kyprianou account, such as receiving payments that did not reference the remitter's name or account number, made it possible for Kyprianou to launder his ill-gotten funds through Lloyds' accounts. *Id.* ¶¶ 50, 82.

Additionally, the complaint alleges that Lloyds created a false document that aided Kyprianou in his fraud. In response to an audit inquiry concerning the cash in AremisSoft's bank

6

accounts from Pavlos Meletiou, a co-conspirator of Kyprianou who purported to act as AremisSoft EE.ME.A's auditor, Lloyds issued a letter (the "Confirmation Letter") in March 2001 stating that since December 29, 2000, Lloyds was holding $9.98 million "blocked in favour of AremisSoft (EE.ME.A) Ltd." *Id.* ¶ 61. The Confirmation Letter was signed by Moore-Piacentini and Sylvie Orsatti, the Assistant Manager at Lloyds. *Id.* Lloyds, however, allegedly did not hold $9.98 million blocked in favor of AremisSoft; neither AremisSoft EE.ME.A nor any other AremisSoft entity had an account at Lloyds, as the "supposedly blocked funds, if ever blocked at all, were in an account in the name of, or for the benefit of, Kyprianou." *Id.* ¶ 63. This letter, which was relied on by the Company's auditors in preparing their opinion on the finances of the Company and by the Company itself, caused AremisSoft to include false and misleading information in its publicly filed financial statements, delaying the discovery of the fraud. *Id.* ¶ 66.

Despite the media reports appearing in May of 2001 raising red flags about AremisSoft, Lloyds continued to do business with Kyprianou, permitting him to open an account in the name of AremisSoft EE.ME.A in June of 2001, even though that entity had no offices, personnel, or business operations in Switzerland. *Id.* ¶ 69. On June 8, 2001, Lloyds transferred over $10 million (the $9.9 million supposedly "blocked in favour of AremisSoft Ltd" plus interest) from the Kyprianou account to the newly opened Lloyds-EE.ME.A account. *Id.* ¶ 70. On June 29, 2001, after disclosure of fraud in the reporting of revenues generated by a healthcare contract in Bulgaria, Lloyds permitted transfer of $200,000 from this account to another account in Sofia, Bulgaria. *Id.* The complaint maintains that even after Kyprianou had been indicted for money laundering, Lloyds permitted at least three transfers to Kyprianou accounts at the bank. *Id.* ¶ 80. Nearly all transfers referenced Moore-Piacentini. *Id.* ¶¶ 78, 80. Lloyds's conduct with regard to these accounts, it is maintained, frustrated the tracing of the proceeds of Kyprianou's fraud. LaSala Decl. ¶ 4.

The complaint states five counts. Counts I-IV allege aiding and abetting a breach of fiduciary duty, aiding and abetting fraud, fraud, and negligent misrepresentation. Count V is a tort claim arising under Swiss law for alleged violations of the Swiss Penal Code ("SPC") and the Federal Act on Prevention of Money Laundering in the Financial Sector ("Money Laundering Act"). The Money Laundering Act requires banks to verify the identity of the customer opening an account by examining proper documentation, requires banks to identify the beneficial owner of the assets in the account if the customer is not the owner, and requires additional investigation and reporting measures where a customer engages in unusual transactions or there is reason to suspect that assets in the account are proceeds of criminal conduct. Compl. ¶ 107. Article 305ter of the SPC prohibits financial intermediaries from accepting, holding on deposit, investing, or transferring assets or failing to determine the identity of the beneficial owner of the assets without the necessary diligence required by circumstances, *see id.* ¶ 105; and Article 305bis of the SPC prohibits anyone from taking action to frustrate the discovery, tracing, or recovery of funds he or she knows or must assume are the proceeds of criminal conduct, *see id.* ¶ 106. Plaintiffs contend that civil damages are available under Article 41 of the Swiss Code of Obligations ("CO") for violations of Articles 305ter and 305bis of the SPC as well as for violations of the Money Laundering Act, and they contend that Article 55 of the CO, which sets forth circumstances under which a principal is liable for damages caused by its employees, is also applicable. *Id.* ¶ 109.

**D.   Judge Pisano's Decision**

After defendant's motion had been filed but before it was fully briefed, District Judge Pisano dismissed a similar case brought by the same plaintiffs in the District of New Jersey against two private Swiss banks. *See LaSala & Zeidman v. Bordier et Cie & Dominick*, 452 F. Supp. 2d 575 (D. N.J. 2006). The complaint in that case had, like the complaint at bar, asserted tort and Swiss law claims. Judge Pisano dismissed all the claims on the ground that the entire action was

preempted by SLUSA. *Id.* at 579-91.

In that case, defendants had filed a separate motion to dismiss on the basis of *forum non conveniens* and lack of personal jurisdiction, but "contend[ed] that dismissal under SLUSA . . . is a subject matter jurisdiction inquiry pursuant to Rules 12(b)(1) and 12(h)(3)." 452 F. Supp. 2d at 577 n.1. While Judge Pisano noted that the case had been brought on the basis of diversity jurisdiction, he said, "The Court need not resolve whether this motion is properly brought pursuant to Rule 12(b)(1) and/or Rule 12(h)(3)," because the parties agreed that SLUSA would be addressed before other pending motions and the outcome of his SLUSA analysis rendered the other pending motions moot. *Id.*

SLUSA preemption is certainly a question of subject matter jurisdiction when the case comes to federal court via removal from a state court. *See Spielman v. Merrill Lynch et al.*, 332 F.3d 116, 122-25 (2d Cir. 2003); *Aruaujo v. John Hancock Life Ins. Co.*, 206 F. Supp. 2d 377, 380 (E.D.N.Y. 2002). For claims that fall within SLUSA, the statute preempts actions removed from state courts "by essentially converting a state law claim into a federal claim," *Spielman*, 332 F.3d at 123, and then mandating its dismissal. As Judge Lynch of this Court has pointed out, however, the statute contains separate provisions concerning "preemption as a jurisdictional mechanism requiring removal" and "preemption as a defense to state-law claims." *Winne v. Equitable Life Assurance Soc. of U.S*, 315 F. Supp. 2d 404, 409 (S.D.N.Y. 2003). Preemption therefore appears in SLUSA in the form of *both* a jurisdictional provision *and* a failure to state a claim provision. Normally, as Judge Newman pointed out in a concurring opinion in *Spielman*, the two are "the opposite sides of the same coin." *Spielman*, 332 F.3d at 132. *See also Winne*, 315 F. Supp. 2d at 409. The case at bar was not *removed* from a state court to this Court. Plaintiffs *initially* filed their complaint in this Court on the basis of diversity of citizenship. In consequence, SLUSA is a preemption *defense* and, as such, one of a number of preliminary grounds for dismissal, among

9

which a judge has discretion to choose when deciding whether to dismiss a case. *See Sinochem Int'l Co. Ltd. v. Malaysia Int'l Shipping Corp.*, 127 S. Ct. 1184, 1186 (2007) (a federal court "has leeway to choose among threshold grounds for denying audience to a case on the merits") (citation and internal quotation marks omitted). In the exercise of that discretion, I consider first the *forum non conveniens* ground for dismissal.

## II.  DISCUSSION

### A.      *Forum Non Conveniens*

The doctrine of *forum non conveniens* permits a court to dismiss an action "even if the court is a permissible venue with proper jurisdiction over the claim." *Carey v. Bayerische Hypo-Und Verinsbank AG*, 370 F.3d 234, 237 (2d Cir. 2004) (citation omitted).  A district court should dismiss a complaint where, on balance, the resolution of the matter in an adequate alternative forum would be more convenient for the parties and courts and more just.  *See R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991) ("The central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice."). "The first step in a *forum non conveniens* analysis is for the court to establish the existence of an adequate alternative forum.  Second, the court must determine the level of deference to accord the plaintiff's choice of forum.  Third, the court must weigh the public and private interests in order to determine which forum will be most convenient and will best serve the ends of justice." *USHA (India), Ltd. v. Honeywell Int'l, Inc.*, 421 F.3d 129, 134 (2d Cir. 2005) (emphasis in original) (internal quotation marks omitted).

A decision to dismiss "lies wholly within the broad discretion of the district court and may be overturned only when we believe that discretion has been *clearly abused.*" *Honeywell International*, 421 F.3d at 134 (emphasis in original) (internal quotation marks omitted). "In the last analysis, it always must be borne in mind that there is no algorithm that assigns precise weights

to the factors that inform *forum non conveniens* determinations. The doctrine instead is intensely practical and fact-bound. The most that may be said is that courts reach informed judgments after considering all of the pertinent circumstances." *First Union Nat'l Bank v. Paribas,* 135 F. Supp. 2d 443, 448 (S.D.N.Y. 2001), *aff'd sub nom., First Union Nat'l Bank v. Arab African Int'l Bank*, 48 Fed. Appx. 801 (2d Cir. 2002) (unpublished opinion).

### 1.    Adequacy of the Alternative Forum

An alternative forum is adequate "if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding Ltd. v. Chase Manhattan Bank,* 329 F.3d 64, 75 (2d Cir. 2003). The test does not mean that the same degree of relief must be available in the alternative forum. *See Fitzgerald v. Texaco, Inc.,* 521 F.2d 448 (2d Cir. 1975) (district court "has discretion to dismiss an action under the doctrine of forum non conveniens, . . . even though the law applicable in the alternative forum may be less favorable to the plaintiff's chance of recovery"). "Absent . . . a fundamental obstacle to a plaintiff's recovery . . . American courts are not prone to characterizing a sovereign nation's courts as 'clearly unsatisfactory.' International comity plays a part in this context as well." *Sussman v. Bank of Israel,* 801 F. Supp. 1068, 1076 (S.D.N.Y. 1992), *aff'd,* 990 F.2d 71 (2d Cir. 1993).

Defendant may properly be sued in Switzerland, *see* Decl. Ursula Cassani in Supp. Def.'s Mot. Dismiss, dated Jul. 21, 2006 ("Cassani Decl."), ¶¶ 42-45, and thus only the second part of the test is at issue. The parties agree that if this case were tried in Switzerland, and Swiss law were applied, Swiss law affords plaintiffs "no causes of action analogous to Counts I through IV of the complaint." Pl.'s Mem. in Opp'n, at 9 (citing Cassani Decl. ¶¶ 99-110; Decl. Mark Pieth in Supp. Pl.'s Mem. in Opp'n, dated Sept. 21, 2006 ("Pieth Decl."), ¶¶ 69-73). Plaintiffs contend that since "Switzerland does not recognize the majority of the AremisSoft Trust's claims," it is an inadequate alternative forum. *Id.* The Second Circuit, however, has made it abundantly clear that "[t]he

availability of an adequate alternate forum does not depend on the existence of the identical cause of action in the other forum," *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998). *Cf. Zweig v. Nat'l Mortgage Bank of Greece*, No. 91 Civ. 5482, 1993 WL 227663, at \*9 (S.D.N.Y. June 21, 1993) (plaintiffs' contention that only one legal remedy remains in Greece due to tolling of Greek statute of limitations is incorrect and thus plaintiffs have "a number of options that remain viable" and there is no "fundamental obstacle" to plaintiffs' recovery). Courts in this district have in some cases found overseas fora inadequate where plaintiffs have sued under particular U.S. statutory regimes, *see Greenlight Capital, Inc. v. Greenlight (Switzerland) S.A.*, No. 04 Civ. 3136, 2005 WL 13682, at \*5 (S.D.N.Y. Jan. 3, 2005) (inadequacy of alternative forum stemmed from the fact that "[t]rademark rights are largely territorial, as they exist in each country solely according to that country's statutory scheme") (citation and some internal quotation marks omitted)). However, the present plaintiffs' causes of action that will fail in Switzerland are not based on U.S. statutory law but rather on common law tort. The mere fact that Switzerland's tort law does not provide the same causes of action as ours does not render it inadequate. In addition, where portions of Swiss law are designed to prevent banks from facilitating money laundering, it cannot be said that the forum fails to permit "litigation of the subject matter of the dispute." Consequently, the courts of Switzerland constitute an adequate alternative forum.

## 2.    Deference Due to Plaintiffs' Choice of Forum

The adequacy of the alternative forum having been determined, the next question is the amount of deference to be given plaintiffs' choice of forum. In cases with foreign defendants, the home forum for the plaintiff is any federal district in the United States, not the particular district in which the plaintiff lives. *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 146 (2d Cir. 2000); *Jacobs v. Felix Bloch Erben Verlag fur Bhune Film und Funk KG*, 160 F. Supp. 2d 722, 743 (S.D.N.Y. 2001). Thus in this case I must consider the deference that should be given plaintiffs'

12

choice to sue in the United States (not New York specifically) as opposed to Switzerland.

In the Second Circuit, the "degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc). Considerations include "the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice," which encompasses "convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district." *Id.* at 72. Plaintiffs argue that they fall at a very high point on this sliding scale. They maintain that they have a significant connection to the United States, as this is where AremisSoft was incorporated, where the bankruptcy Trust was established, and where the beneficiaries of the Trust are located. *See* Pl.'s Mem. in Opp'n, at 6-8. They also argue that their choice of forum was motivated by factors of convenience rather than forum shopping. *See id.* at 7. I agree that plaintiffs have significant ties to the United States and legitimate reasons for preferring to prosecute this action in the United States, such as convenience and expense and their interest in having an American judge decide issues that they maintain arise under American law.

However, in the Second Circuit, deference *is* diminished when "plaintiff is a corporation doing business abroad and can expect to litigate in foreign courts." *Guidi v. Inter-Continental Hotels Corp.*, 224 F.3d 142, 147 (2d Cir. 2000). *See Morrison Law Firm v. Clarion Co., Ltd.*, 158 F.R.D. 285, 287 (S.D.N.Y. 1994) ("The private interest of plaintiffs in suing in its [sic] home location is diluted because it chose to do business with Japanese firms and to seek their custom, making it logical that they be required to litigate there, a result which should not expose plaintiff to surprise."); *CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*, No. 97 Civ. 4646, 1998 WL 512951, at *7 (S.D.N.Y. Aug. 18, 1998) (while "it remains defendants' burden to overcome the forum choice made by these American-citizen plaintiffs," for plaintiffs "who are involved in a decidedly

13

international dispute such as this, their American citizenship and residence do not constitute the powerful, near-decisive factors for which they contend") (citation and internal quotation marks omitted). A plaintiff's choice of forum is also "given reduced emphasis where . . . the operative facts upon which the litigation is brought bear little material connection to the chosen forum." *Nieves v. Am. Airlines*, 700 F. Supp. 769, 772 (S.D.N.Y. 1988). *See also Zweig*, 1993 WL 227663, at *4 (notwithstanding plaintiff's American citizenship and residency, dismissal in favor of Greece is warranted because operative facts on which the litigation was based bore little connection to New York).

Plaintiffs are not a corporation doing business abroad, but they are suing on behalf of a trust whose governing document specifically authorizes litigation abroad. Plaintiffs have already litigated in several foreign countries. *See* Compl. ¶¶ 31-36. Plaintiffs therefore more closely resemble a corporation with substantial resources than ordinary citizens of comparatively modest means. *See Carey*, 370 F.3d at 238 (in the case of an "individual of modest means," this "individual's choice of the home forum may receive greater deference than the similar choice made by a large organization which can easily handle the difficulties of engaging in litigation abroad"). Moreover, the operative facts of this litigation unquestionably took place in Switzerland. *See infra* Part II.A.3.b. I therefore conclude that while plaintiffs' choice of forum is entitled to some deference, it does not operate at full strength.

Additionally, I note that "[a] citizen's forum choice should not be given dispositive weight. . . . [D]ismissal should not be automatically barred when a plaintiff has filed suit in his home forum. As always, if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256 n. 23 (1981) (citations omitted). *See also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 102 (2d Cir. 2000) (There is no "rigid rule of decision

14

protecting U.S. citizen or resident plaintiffs from dismissal for *forum non conveniens*"; rather, a court "must take into account the hardship dismissal would cause to a resident plaintiff"); *Paribas*, 135 F. Supp. 2d at 447 ("[T]he weaker the connection between a plaintiff's U.S. activities, even those of a U.S. plaintiff, and the events at issue in the lawsuit, the more likely it is that defendants attacking the plaintiff's choice of a U.S. forum will be able to marshal a successful challenge to that choice.").

Courts in this Circuit have numerous times dismissed suits by an American citizen or entity in favor of a foreign jurisdiction. *See, e.g.*, *Alcoa Steamship Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147 (2d Cir. 1978) (en banc) (in suit by American corporation, Trinidad held to be more appropriate forum); *Farmanfarmaian v. Gulf Oil Corp.*, 588 F.2d 880 (2d Cir. 1978) (dismissing suit by Iranian national on the basis of *forum non conveniens* despite treaty that mandated court access equivalent to American citizen); *Telephone Sys. Int'l, Inc. v. Network Telecom PLC*, 303 F. Supp. 2d 377, 384-85 (S.D.N.Y. 2003) (dismissing in favor of United Kingdom despite presumption in favor of American corporation's choice of United States forum because "[t]hat presumption in favor of a plaintiff's convenience is not absolute and may be outweighed"); *Realuyo v. Villa Abrille*, No. 01 Civ. 10158, 2003 WL 21537754, at *4 (S.D.N.Y. Jul. 8, 2003) (finding, in concluding that the Philippines would be more appropriate jurisdiction, that "[a]lthough [American plaintiff's] forum choice warrants great deference, it is in this case outweighed by every other consideration"); *Paribas*, 135 F. Supp. 2d at 447; *Panama Processes S.A. v. Cities Serv. Co.*, 500 F. Supp. 787, 792 (S.D.N.Y. 1980) (American citizenship has "no particular effect" where other factors favor dismissal), *aff'd*, 650 F.2d 208 (2d Cir. 1981).

In this case, because plaintiffs are not an entity that stands to experience hardship of the kind that would be suffered by an individual plaintiff of modest means, I conclude that the deference due to plaintiffs is not so significant as to outweigh other factors if they weigh in favor of

15

defendant.

### 3.    Private and Public Interests

In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947), the Supreme Court set forth private and

public interest factors to be considered by the district court in determining which forum is most

convenient and will best serve the ends of justice. These include "the ease of access to sources of

proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining the

attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy,

expeditious and inexpensive." *Gilbert*, 330 U.S. at 508. Public interest factors include

administrative difficulties stemming from court congestion, the interest in having "localized

controversies decided at home," and the interest in having issues of foreign law decided by a

foreign tribunal. *Id.* at 508-09.

#### a.    *Private Interest Factors*

Where alleged misconduct is centered in the foreign forum and the majority of evidence

resides there, dismissal is favored. *See Strategic Value Master Fund v. Cargill Fin. Servs. Corp.*,

421 F. Supp. 2d 741, 766 (S.D.N.Y. 2006) (granting motion to dismiss in favor of England). *See

also Acosta v. J.P. Morgan Chase*, 06 Civ. 995, 2007 WL 689529, at *2 (2d Cir. Mar. 6, 2007)

(nothing unreasonable in district court's conclusion that inconvenience of transporting witnesses

and translating documents from Spanish to English favors dismissal) (unpublished opinion);

*Carey*, 370 F.3d at 238-39 (district court's decision to dismiss in favor of Germany was proper due

to difficulty otherwise to be incurred by German defendant in securing presence of its witnesses in

the United States and due to reasonableness of requiring plaintiff to litigate business transaction

dispute in the country where it occurred); *Zweig*, 1993 WL 227663, at *7 (Greece more

appropriate forum where "majority of the witnesses and documentary evidence" is located there).

In this case, the vast majority of relevant evidence appears to be located in Switzerland,

where the Bank accounts were opened and administered. According to defendant, documents pertaining to the accounts are exclusively in the possession of the Geneva branch of Lloyds. Decl. Beat Kunz in Supp. Def.'s Mot. Dismiss, dated Jul. 21, 2006 ("Kunz Decl."), ¶ 12. Defendant argues that a complex statutory banking secrecy regime in Switzerland would make it difficult for documents to be obtained from Switzerland for the purpose of proceedings here. *See* Def.'s Mem., at 15 (citing Casani Decl. ¶¶ 28-33). Plaintiffs maintain, by contrast, that the United States houses important documents because each transfer of dollars from the Lloyds accounts had a corresponding transaction in the United States at a New York correspondent bank. *See* Pl.'s Mem. in Opp'n at 14; LaSala Decl. ¶¶ 16, 45. They also maintain that documentary evidence related to the AremisSoft fraud has been accumulated by the Trust and by the United States government in the United States, and that the Trust has further accumulated documents, at present located in New York, through discovery proceedings in the British Virgin Islands and in England. Pl.'s Mem. in Opp'n, at 14; LaSala Decl. ¶¶ 39-45.

Even if documentation in the United States of corresponding dollar transfers were of use in the case, I do not see how it could be more helpful than documentation of the actual transfers made through the Lloyds accounts in Switzerland. Moreover, plaintiffs have not indicated that the correspondent bank records include documentation concerning the initiation and administration of the accounts, as opposed to merely the transfers occurring in them. Finally, documentation pertaining to the fraud perpetrated by Poyiadjis and Kyprianou does not appear to concern the actions of the Bank that are at issue in this case. All together, the documentary evidence offered by defendant appears to be more relevant, and thus the location of these documents weighs in favor of Switzerland. However, in an age of electronic communication, where files are usually kept in digital form, this factor does not carry enormous weight. *See Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London et al.*, 940 F. Supp. 528, 537-38 (S.D.N.Y. 1996), *aff'd*

17

147 F.3d 118 (2d Cir. 1998) ("[I]n light of technological advances in transportation and communication, this Court recognizes that the location of documents is a factor which is to be given less weight now. . . .").

The location of witnesses is a factor in the private interests analysis carrying greater weight. Plaintiffs name a number of witnesses who reside in this country. *See* Pl.'s Mem. in Opp'n, at 11-12. First, they name Poyiadjis, who is in the custody and control of the United States Department of Justice. Plaintiffs state that he would be able to testify about how Kyprianou directed him and his operatives to transfer approximately $44 million to an account Kyprianou had opened at Lloyds through a cousin of his wife, that there was an arrangement with Lloyds to conceal the source of the funds in accounts owned and controlled by Kyprianou, and that the Confirmation Letter issued by Lloyds was false and misleading, *see* LaSala Decl. ¶¶ 26, 27. Second, plaintiffs list Robert Peak, the principal accountant at the SEC involved in the investigation of AremisSoft. *Id.* ¶¶ 31-33. They next cite the usefulness of the testimony of Courtney Wilson, the FBI Special Agent in charge of the investigation of AremisSoft. *Id.* ¶ 34. Plaintiffs contend that testimony from Poyiadjis and the U.S. government employees could be obtained in New York but not in Switzerland, *see* Pl.'s Mem. in Opp'n at 11-14. Plaintiffs suggest that non-party representatives of the New York correspondent banks would be of use, and they also indicate that former officers and directors of AremisSoft, who all reside in the United States, might be called as witnesses. *Id.* ¶¶ 35-36. These include George Ellis, former member of the Board of Directors of AremisSoft, and David Latzke, who became CFO of AremisSoft after the resignation of Kyprianou. These persons would testify as to the deception and fraud wrought on the Board by Kyprianou and the internal investigation of the fraud after it was uncovered. *Id.* ¶ 36. Finally, plaintiffs assert that Mr. LaSala himself would be called to testify about the Trust and the damages sustained by AremisSoft and its former investor. *Id.* ¶ 37.

18

Defendant counters plaintiffs' claim about Poyiadjis's centrality to the case by pointing out that his name was not mentioned even once in the complaint's description of Lloyds' alleged misconduct. *See* Def.'s Reply Mem., at 6 (citing Compl. ¶¶ 48-82). Defendant also questions the helpfulness of testimony from the government employees. *Id.* Defendant, instead, identifies a number of witnesses, for the most part current or former employees of the Bank, who defendant asserts are all residing in Switzerland, with the exception of one Swiss national who resides in Cyprus. Def.'s Mem., at 16-17. Key among these are Jane Moore-Piacentini, who is alleged to have been the primary employee at Lloyds responsible for the accounts at issue, and Roger Meyer, one of the trustees of a trust through which tens of millions of dollars were allegedly laundered by Kyprianou. In the related case against UBS, Meyer is alleged to be a private money manager and investor advisor with an address in Switzerland, and he allegedly directed the very transactions as to which Moore-Piacentini and Lloyds are accused of violating Swiss money laundering laws. *See* Def.'s Mem., at 16, 18. Neither of these witnesses is in the employ of Lloyds, and both reside in Switzerland. *See* Kunz Decl., ¶¶ 2, 11. In addition, defendant identifies six Lloyds employees and former employees who were co-signers of the Confirmation Letter or were otherwise involved in managing the Lloyds-Kyprianou account. *See* Def.'s Mem. at 17; Kunz Decl. ¶¶ 4-9. Finally, defendant indicates that officers and employees of the Bordier and Dominick banks, who presumably reside in Switzerland, would be additional non-party witnesses. *See* Def.'s Mem., at 18.

While the witnesses mentioned by plaintiffs undoubtedly would have something to say about the overall scheme perpetrated by Poyiadjis and Kyprianou, I fail to see how they would assist a fact-finder in determining what Bank employees knew and did surrounding the particular accounts at issue in this case. As Judge Weinfeld noted in a situation where an alleged fraudulent scheme occurred in Switzerland but the defendant contended that New York witnesses were

important, "The New York witnesses can testify only as to how undisputed trades were executed. These matters, if pertinent at all, are not even of secondary significance; they are subordinate to the basic issue central to plaintiff's claims. . . . [The alleged fraudulent scheme] occurred in Geneva at Banque and Advicorp. Those who performed the fraudulent acts and issued directions in furtherance thereof did so there." *Fustok v. Banque Populaire Swisse*, 546 F. Supp. 506, 511 (S.D.N.Y. 1982). I am persuaded that the witnesses identified by defendant have the more relevant first-hand knowledge of the pertinent facts in this case concerning the Bank's conduct, and these witnesses reside in Switzerland.

Plaintiffs next argue that defendant can cause its employees to appear in the United States to testify and that to the extent that non-party witnesses reside abroad, the Hague Convention on Taking Evidence Abroad is an adequate means to compel documents and witness testimony. *See* Pl.'s Mem. in Opp'n, at 13. However, this private interest factor is about convenience to the parties; thus the presence of the vast majority of witnesses in one forum weighs in favor of that forum, even if the witnesses could be transported. *See Europe & Overseas Commodity Traders*, 940 F. Supp. at 538 (where nearly all witnesses reside overseas, "transporting witnesses from England to the United States – even if they were within this Court's subpoena power or would appear voluntarily – would be extremely inconvenient and would impose a prohibitive cost on defendants"); *Scottish Air Int'l Inc. v. British Caledonian Group, PLC*, 81 F.3d 1224, 1232-33 (2d Cir. 1996) (affirming district court's dismissal on *forum non conveniens ground* and noting that since vast majority of potential witnesses were residents of Great Britain, "the difficulty, cost, and disruption of requiring the attendance of such witnesses in New York – whether they were willing to appear or not – would be considerable" and this weighed in favor of dismissal). In addition, for those who could not be compelled to testify in the United States, obtaining evidence by means of letters rogatory pursuant to the Hague Convention is a poor substitute for live trial testimony. *See*

*Scottish Air*, 81 F.3d at 1233 (noting that in prior case, the Second Circuit established that "the live testimony of key witnesses was necessary where the plaintiffs alleged that the defendants had conspired to defraud them. We deemed such testimony necessary for the jury to assess the witnesses' credibility"); *Allstate Life Ins. Co v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir. 1993) (affirming *forum non conveniens* dismissal of securities fraud action in favor of Australia where plaintiffs alleged fraud and noting that "live testimony of key witnesses is necessary" in such cases); *Schertenleib v. Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978) (for important non-party Swiss witnesses, obtaining testimony by means of letters rogatory would be "very serious handicap" favoring dismissal on the ground of *forum non conveniens*); *Paribas*, 135 F. Supp. 2d at 450 (there exists a "strong preference for live trial testimony"). As two non-party witnesses residing in Switzerland – Moore-Piacenti and Meyer – are likely to be key witnesses, this additionally weighs in favor of the Swiss forum.

Another consideration pertaining to the witnesses and documents is translation. Defendant notes that many witnesses may testify through an interpreter. *See* Def.'s Mem., at 17. This also weighs in favor of dismissal. *See Schertenleib*, 589 F.2d at 1165 ("serious problem of translation" of live testimony and documents in Switzerland is factor supporting dismissal); *Fustok v. Banque Populaire Swisse*, 546 F. Supp. 506, 510 (S.D.N.Y. 1982) ("In addition to the expense and inconvenience of travel for these [foreign] witnesses, if that were contemplated, many of them do not speak English as a primary language which would present an added obstacle to a smooth flowing trial in this District."). Even putting aside the question of cost, the difficulties presented to a court's assessment of witness credibility are considerable. *See Fustok*, 546 F. Supp. at 510 ("In addition to the expense and inconvenience of travel for these [foreign] witnesses, if that were contemplated, many of them do not speak English as a primary language which would present an added obstacle to a smooth flowing trial in this District."). *See also Zweig*, 1993 WL 227663, at *8

21

(amount of translation of documents and testimony that would be required if litigation remained in New York far outweighs amount if action were litigated in Greece).

In sum, I am not persuaded that evidence from the U.S. sources proffered by plaintiffs would be more relevant than evidence originating from the locale of the complained-of conduct. Based on the location of documents and relevant witnesses, I conclude that the private interest factors favor defendant.

### b.    Public Interest Factors

Public interest factors include judicial economy, the interest in having "localized controversies decided at home," and the interest in having issues of foreign law decided by a foreign tribunal. *Gilbert*, 330 U.S. at 508-09. As Judge Kaplan has explained, "[T]here is little sense to allowing a U.S. citizen to haul a group of foreign defendants into a U.S. court on transactions having little or nothing to do with this country where there is an available foreign forum significantly better suited to handling the litigation in a prompt, efficient and effective manner." *Paribas*, 135 F. Supp. 2d at 448 (dismissing fraud claims against French bank in favor of London, where fraudulent activity was centered). *See also Zweig*, 1993 WL 227663, at *4 (dismissing claims of New York plaintiff against Greek bank, even though plaintiff alleged he was defrauded in New York, because actions by Greek bank took place in Greece).

I turn first to the public interest in having localized controversies decided at home. This requires an evaluation of which forum possesses a stronger local interest in the controversy. *See Pollux Holding*, 329 F.3d at 76 (affirming district court's determination that London has a "stronger local interest" in the controversy because, *inter alia*, the derivative instrument at issue was purchased there, the alleged fraud and misrepresentations primarily occurred there, and the alleged breach of contract and breach of fiduciary duty arose out of contracts entered into there). Plaintiffs point to the interest of the United States in safeguarding transactions involving U.S.

currency and in "ensuring that foreign banks are not havens for criminals who steal and launder U.S. currency." Pl.'s Mem. in Opp'n, at 15. They also point to the interest of the United States in adjudicating matters affecting its residents. *See id.* Plaintiffs argue that the existence of related civil and criminal actions in this district also causes the public interest to weigh in favor of the United States. *See id.* at 16. Finally, plaintiffs cite as a United States interest the fact that their claims "are predominantly brought" under U.S. law. *Id.* Defendant, by contrast, maintains that Switzerland possesses a strong interest in regulating the conduct of banks in its own country. *See* Def.'s Mem. at 19-20. Defendant also stresses Switzerland's interest in applying its own law, particularly where that law is disputed. *Id.* at 20.

I am persuaded that Switzerland possesses the strongest interest in this case. The United States may have some interest in ensuring that American currency not be laundered, but the argument that dollar transfers through banks in the United States creates a strong public interest in favor of the Untied States has been rejected by courts in this Circuit. *See, e.g., Lan Assocs. XVIII v. Bank of Nova Scotia*, No 96 Civ. 1022, 1997 WL 458753, at \*6 (S.D.N.Y. Aug. 11, 1997) (alleged wire transfer of funds in New York is insufficient to create public interest link to New York) ("Were such minimal contact with New York to be deemed significant, this Court, located in one of the world's largest and busiest financial centers, would be burdened with countless international financial disputes having no real, substantive link to New York."); *see also Calgarth Invs. Ltd v. Bank Saderat Iran*, No 95 Civ. 5332, 1996 WL 204470, at \*6 (S.D.N.Y. Apr. 26, 1996) ("[D]ebits and credits at New York bank accounts, without more, do not give New York or the United States an interest in transactions that otherwise are entirely foreign."), *aff'd*, 108 F.3d 329 (2d Cir. 1997) (mem.); *Sussman*, 801 F. Supp. at 1074 (bank's "use of its New York Branch . . . to route the loan proceeds . . . cannot be regarded, in the overall scheme of things, as other than peripheral," and this is true "even if this routing of the funds was for the purpose of evading Israeli law"). In this case,

there is even less connection between the underlying events and the United States than in *Zweig*. As for plaintiffs' argument that adjudicating the interests of its residents is a United States interest, I agree that this interest exists, but it stands in equipoise to Switzerland's interest in adjudicating matters affecting its residents.

Whatever interest the United States has, it pales in comparison with that of Switzerland. Switzerland possesses a strong interest in regulating the conduct of banks within its borders. *See Zweig*, 1993 WL 227663, at *10 (despite the fact that plaintiff was allegedly defrauded in New York and made visit to branch of Greek bank in New York, quoting *Sussman* for the proposition that "Greece's public interest in the issues raised by these charges dwarfs the public interest of New York, which is minimal"). There is no question that this dispute centers around events occurring there. The Bank accounts were opened in Switzerland, and the transfers alleged to have been improperly permitted by the Bank were authorized by personnel there. This is at its heart a dispute involving what Swiss banking representatives did and what they knew when they did these things. The knowledge plaintiffs allege on the part of the Bank, both concerning its legal obligations and concerning the fraudulent nature of Kyprianou's transfers, exists only in the minds of Bank representatives in Switzerland. If, to quote *Gilbert*, it is preferable that "localized controversies" be "decided at home," Switzerland is home for the controversies generated by the plaintiffs' complaint.

I agree with plaintiffs that the law to be applied augments the interest of the forum possessing the applicable law, *see* Pl.'s Mem. in Opp'n, at 16, as this implicates both the local interests possessed by the competing jurisdictions and the *Gilbert* Court's assessment that it is more appropriate to try a diversity case "in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself." *Gilbert*, 330 U.S. at 509. However, I disagree with plaintiffs'

24

position that the law of a state of the Untied States applies to Counts I-IV of the complaint. *See* Pl.'s Mem. in Opp'n, at 27-28.

Courts often do not decide choice of law issues when performing a *forum non conveniens* analysis, *see Piper Aircraft*, 454 U.S. at 251 (judges considering *forum non conveniens* motions need not conduct an elaborate choice-of-law analysis because the doctrine "is designed in part to help courts avoid conducting complex exercises in comparative law"), but sometimes they do undertake the analysis. *See Zweig*, 1993 WL 227663, at *9 (need to engage in choice of law analysis, in which Greek law is found to apply, "plays an important role" in decision to dismiss under *forum non conveniens*). The mere likelihood of the application of foreign law weighs in favor of dismissal. *See Pollux Holding*, 329 F.3d at 76 (affirming as proper exercise of discretion district court's determination that application of English law favored adjudication in England); *Calavo Growers v. Generali Belgium*, 632 F.2d 963, 967 (2d Cir. 1980) ("[T]he likelihood that Belgian law would govern in turn lends weight to the conclusion that the suit should be prosecuted in that jurisdiction."); *Paribas*, 135 F. Supp. 2d at 453 (likelihood that court would have to apply English law to part or entirety of case "cuts to some degree in defendants' favor").

Since a federal court sitting in diversity applies the choice of law rules of the forum state, *see Klaxon v. Stentor Elec. Mfg.*, 313 U.S. 487, 496-97 (1947), which in this case is New York, if New York choice of law rules dictate that this case arises entirely under Swiss law, that outcome would weigh in favor of dismissal. In tort cases, New York courts apply the law of the jurisdiction with the "greatest interest" in regulating behavior within its borders or in having its law applied.[3]

---

[3] As noted in text, Counts I-IV of the complaint include claims against the Bank for aiding and abetting Kyprianou's breaches of fiduciary duty and fraud. Several courts in this district have applied to aiding and abetting claims a doctrine known as the "internal affairs doctrine," which calls for the law of the state of incorporation to be applied to issues relating to the internal affairs of a corporation. *See Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 04 Civ.A. 2476, 2006 WL 278138, at *12 (S.D.N.Y. Feb. 2, 2006) (Batts, J.); *Official Comm. of Unsecured Creditors of Color*

*Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1031 (2d Cir. 1996) (citing cases). This is a "flexible approach intended to give controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation." *Fin. One Public Co. Ltd v. Lehman Bro. Spec. Fin., Inc.*, 414 F.3d 325, 337 (2d Cir. 2005) (citation and internal quotation marks omitted). "The contacts of the parties and occurrences with each jurisdiction are thus factors to be considered in applying interest analysis, together with the policies underlying each jurisdiction's rules, the strength of the governmental interests embodied in these policies, and the extent to which these interests are implicated by the contacts." *Id.*

Plaintiffs suggest that the jurisdiction with the greatest interest in the litigation is the locus of injury, which here is the United States. *See* Pl.'s Mem. in Opp'n, at 27 ("When the law is one

*Tile, Inc. v. Investicorp S.A.*, 80 F. Supp. 2d 129, 134 (S.D.N.Y. 1998) (Cedarbaum, J.); *BBS Norwalk One, Inc. v. Raccolta, Inc.*, 60 F. Supp. 2d 123, 129 (S.D.N.Y. 1999) (Cedarbaum, J.); *Lou v. Belzberg*, 728 F. Supp. 1010, 1023 (S.D.N.Y. 1990) (Sweet, J.). Plaintiffs argue that this doctrine calls for U.S. state law to be applied as AremisSoft was incorporated here. However, both Judges Cedarbaum and Sweet recognized that the "internal affairs doctrine" merely amounts to an assessment "that the state of incorporation has an interest superior to that of other states in regulating the directors' conduct of the internal affairs of its own corporations." *Raccolta*, 60 F. Supp. 2d at 129. In *Raccolta*, Judge Cedarbaum essentially determined that the state of incorporation *was* the jurisdiction with the greatest interest for the aiding and abetting claim. Applying these same principles, Judge Mukasey found that a claim for aiding and abetting a breach of fiduciary duty should simply be analyzed under normal "interest analysis." *See Solow v. Stone*, 994 F. Supp. 173, 177 (S.D.N.Y. 1998), *aff'd*, 163 F.3d 151 (2d Cir. 1998) ("[T]here is no jurisdiction with an interest greater than New York's with respect to these [aiding and abetting] tort claims."). He concluded that while the jurisdiction of incorporation is usually appropriate for claims against directors for breaching a fiduciary duty, it is not appropriate for aiding and abetting claims. *Id. See Granite Partners, L.P. v. Bear, Stearns & Co. Inc.*, 17 F. Supp. 2d 275, 306 n.16 (S.D.N.Y. 1998) (agreeing with *Solow v. Stone* court that aiding and abetting breach of fiduciary claim is governed by law of place where the acts giving rise to the claim took place). Thus, normal interest analysis is appropriate even for plaintiffs' aiding and abetting claims. *See also In re Adelphia Commc'n Corp.*, No. 02-41729, 2007 WL 1673928, at *8 (Bkrtcy. S.D.N.Y. June 11, 2007) (analyzing two lines of case, one applying the "internal affairs" doctrine and the other applying normal interest analysis, and concluding that "the Court believes it should follow the latter line of authority.").

which regulates conduct, such as fraud and breach of fiduciary duty, the law of the jurisdiction where the tort occurred will apply."). In applying interest analysis, New York courts have said that "the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders."[4] *Cooney v. Osgood Machinery,* 81 N.Y.2d 66, 72 (N.Y. 1993). The locus of the tort is where the "last event necessary to make the actor liable occurred." *Simon v. Philip Morris Inc.,* 124 F. Supp. 2d 46, 58 (E.D.N.Y. 2000) (citation omitted). However, this "last place" criterion "is not chiseled in stone, but rather gives way when it is at war with state interests so that the more general *Babcock* principle applies." *Id.* (referring to the landmark interest analysis case *Babcock v. Jackson,* 191 N.E.2d 279 (N.Y. 1963)). In other words, the "last place" criterion does not displace ordinary interest analysis. *See Cromer Fin. Ltd. v. Berger,* 137 F. Supp. 2d 452, 492 (S.D.N.Y. 2001) (refusing to apply the last event necessary test where a single state was overwhelmingly the center of gravity of the events at issue and that state's interest in regulating the conduct of work performed there was strong); *HSA Residential Mortgage Servs. of Texas v. Casuccio,* 350 F. Supp. 2d 352, 365 (E.D.N.Y. 2003) (refusing to apply "last place" criterion in case where plaintiffs alleged that defendant accounting firms prepared and approved fraudulent financial statements and instead applying law of New York which "has a strong interest in defining the scope of liability for accountants who work in its state" and "has the more significant interest in having its conduct-regulating law govern in order to regulate behavior within its borders"). Even the Second Circuit's recent application of the test did not rely on it exclusively in conducting interest analysis. *See White Plains Coat & Apron Co., Inc.*

---

[4] The "place of the wrong" was the jurisdiction applied in tort cases under the old New York choice of law rules, but it was replaced with the more flexible "interest analysis." *See Brinks,* 93 F.3d at 1030 (in discussing New York's shift to the interest analysis approach, "New York courts, recognizing that a State may lack sufficient nexus with a case so that choice of its law is arbitrary or fundamentally unfair, abandoned these rigid rules in favor of a more flexible approach") (internal quotation marks and citation omitted).

*v. Cintas Corp.*, 460 F.3d 281, 285 (2d Cir. 2006) ("[H]ere, where *not only* the vast majority of the conduct supporting the claim occurred in New York, *but also* the damages were suffered at WPL's New York headquarters, New York has the most significant interest and its laws apply.") (emphases added).

In this case, the "last place" or locus of the "last event necessary" is the United States, where the harm allegedly caused by the Bank was felt. A situation such as this, where the alleged misconduct occurred in one jurisdiction, but because of the international nature of a company's business dealings the harm caused by that misconduct was felt in another country, presents precisely the sort of circumstance where a blind adherence to the rule that the last place determines the locus of the tort and therefore the jurisdiction with the greatest interest would result in the jurisdiction which does not possess the greatest interest being deemed so for choice of law purposes. In *Sussman* I held that even where the injury was felt in the United States, "Whether or not defendants' conduct was tortious will be measured by the law of Israel. It is that law upon which the parties, plaintiffs and defendants alike, relied in respect of defendants' conduct; and the interest of Israel in applying its law to admonish or prevent similar conduct in the future assumes a critical, and in my opinion, controlling importance in choice of law analysis." *Sussman*, 801 F. Supp. at 1075 (citing cases to support proposition that "this Court has regarded the place where the victim of fraud or negligence suffered economic loss as less significant for choice of law purposes than the law of the place by which the defendant's conduct is evaluated"). *See also Pollux Holding*, 329 F.3d at 76 (approving district court's assessment that "[g]iven that most of the relevant conduct occurred in England, English law would apply to the preponderance of plaintiffs' tort claims"); *Brinks*, 93 F.3d at 1032 (where injury of theft was felt in the United States, South Africa has greater interest than New York in the alleged willful misconduct or gross negligence of South

28

African Airways, a government instrumentality, and the South African police).

In this case, as discussed *supra*, the contacts between Switzerland and the underlying events are strong, while the contacts with the United States are minimal. *See Finance One*, 414 F.3d at 337 (contacts between Thailand and events are strong but between New York and events are weak where negotiations and other activities surrounding transactions at issue took place in Thailand, Hong Kong, or Tokyo). I conclude that the strength of Switzerland's interest in the litigation outweighs that of the United States. Switzerland's interest in regulating the conduct of banks within its borders, particularly where the bank is a leading financial services provider in the country, is great. The reputability of the country's banking system is intimately connected to the effectiveness of the country's regulation of its banks, and it has a stronger interest in policing its financial systems than does the United States in ensuring that United States dollars are not laundered abroad to the detriment of United States shareholders and a United States company. Because the operative events took place almost exclusively in Switzerland, the contacts with Switzerland directly implicate these significant governmental interests. I therefore conclude that Swiss law applies to plaintiffs' common law tort claims.

Not only does choice of law analysis indicate that Switzerland's interest in the case is greater than that of the United States, but Switzerland's interest in this litigation is all the more keen as the parties dispute the application of Swiss law to Count V. Defendant submits a declaration by Ursula Cassani, a lawyer and a professor at the University of Geneva Law School, and points out the conflict between Ms. Cassani and plaintiffs' expert Mark Pieth, a professor of criminal law and criminal procedure at the University of Basel. *See* Def.'s Mem. at 7-8 (citing Pieth Decl.). The two experts disagree on a number of points that are central to the Swiss law claims, including the following:

- Whether Art. 305ter of the SPC provides a basis for civil liability. *Compare*

29

Cassani Decl. ¶¶ 59-64, *and* Decl. Ursula Cassani, dated Oct. 18, 2006 ("Cassani Reply Decl.") ¶¶ 13-16 (Art 305ter does not protect individual financial interests), *with* Pieth Decl. ¶¶ 45-48 (Art. 305ter could potentially serve as basis for civil liability).

- Whether plaintiffs have pleaded a proper predicate to support a claim under Art. 305bis. *Compare* Cassani Decl. ¶¶ 80-93 (conduct of Lloyds alleged in the complaint does not fall within the ambit of Art. 305bis), *and* Cassani Reply Decl. ¶¶ 11-21, 21-25, *with* Pieth Decl. ¶¶ 55-68 (while insider trading does not constitute predicate offense under SPC, fraud, falsification of titles, and disloyal management might, and thus complaint should not be dismissed).

- What *mens rea* is required for a civil claim for violation of Art. 305bis of the Swiss Penal Code. *Compare* Pieth Decl. ¶¶ 50-54 (cantonal court of Geneva has ruled that an act of money laundering accomplished through negligence can ground a tort claim based on art. 41 CO), *with* Cassani Decl. ¶ 78, *and* Cassani Reply Decl. ¶¶ 18, 19 (*mens rea* issue remains open to debate because only one cantonal court has decided it, and Swiss Federal Supreme Court has never ruled on the issue).

- Whether the Money Laundering Act supports a civil claim. *Compare* Cassani Decl. ¶¶ 94-96 (Act doesn't protect private financial interests), *with* Pieth Decl. ¶¶ 37, 45-47 (while no case law decision on the issue, it may be a mixed rule protecting both public and private interests).

- The scope of the Swiss Banking Act's provisions concerning banking secrecy. *Compare* Cassani Decl. ¶¶ 28-33 (when bank established in Switzerland, including Swiss branch of a foreign bank, is party to civil lawsuit, it is bound by Swiss banking secrecy rules preventing bank from disclosing banking or private information concerning clients), *and* Cassani Reply Decl. ¶ 5, *with* Pieth Decl. ¶¶ 19-24 (while Swiss law places restrictions on witness deposition, the production of documents to a foreign court is not implicated by the statute).

The two experts agree, however, that whether Art. 305ter provides a basis for civil liability has not been conclusively established. *See* Cassani Reply Decl. ¶¶ 13, 14 ("Mr. Pieth rightly points out, as I had in my declaration, that there are no court decisions saying that Art. 305ter SPC or the provisions of the Swiss Anti-Money Laundering Act could be protective norms giving rise to tort liability under Article 41 CO. . . . There are, however, many scholars who have expressed the opinion that there is no Article 41 CO liability for the breach of Article 305ter SPC and of

provisions of the Anti-Money Laundering Act. . . ."); Pieth Decl. ¶ 48 ("I am, furthermore, of the opinion that art. 305ter SPC and the Swiss Money Laundering Legislation could very well serve as a separate basis for an action for tort under art. 41 CO, although I concede that there is so far no case law to support my reasoning.").

Ms. Cassani characterizes the question as "the subject of much controversy among courts and commentators in Switzerland." Cassani Decl. ¶ 65. These two experts also agree that there is no case law thus far on the question of whether the Money Laundering Act provides civil liability under Art. 41 CO. *See* Cassani Decl. ¶ 96; Pieth Decl. ¶ 46. It appears from these points of agreement that the Swiss law in this area is evolving. *See also* Cassani Reply Decl. ¶¶ 11, 12 (while in principle Art. 305bis can provide the basis for liability for money laundering, there are a number of related questions still unresolved by the courts). For plaintiffs to say in their memorandum that "[t]his Court is asked merely to interpret settled areas of Swiss law and apply them to the facts before it" bulldozes over complexities that are carefully presented by both experts.

Both the areas in which Ms. Cassani and Mr. Pieth disagree and the common ground they find over the unsettled nature of the law militate against adjudicating this case in this District. In the first instance, it is inadvisable for this Court to decide a case where legal experts disagree about critical points in the application of the foreign law. *See Schertenleib*, 589 F.2d at 1165 ("Swiss law appears to apply to the tort claims. This necessitates the introduction of inevitably conflicting expert evidence on numerous questions of Swiss law, and it creates the uncertain and time-consuming task of resolving such questions by an American judge unversed in civil law tradition."); *Fustok*, 546 F. Supp. at 513 ("With Swiss legal experts in such sharp dispute as to Swiss law and the holding of Swiss high court rulings, the matter is best left to knowledgeable Swiss jurists."); *Panama Processes*, 500 F. Supp. at 798 (possibility of having to "parse significant

31

substantive and procedural questions of [foreign] law" weighs in favor of dismissal). It is even less advisable for this Court to decide issues of Swiss law that both experts *agree* are unsettled. The seeming necessity of this Court's deciding a complex and unsettled issue of Swiss law is a powerful factor weighing in favor of dismissal. I therefore conclude that the public interest strongly favors Switzerland.

Because the private interest also favors Switzerland, and it is an adequate alternative forum, I hold that the measure of deference due to plaintiffs' choice of forum is outweighed, and dismissal on the ground of *forum non conveniens* is warranted.

## B. SLUSA Preemption

Although the complaint will be dismissed on the basis of *forum non conveniens*, I will discuss the other grounds for dismissal urged by the Bank in this motion, so that the Court of Appeals will be aware of this Court's opinion on all issues if it decides to reverse the *forum non conveniens* dismissal. I begin with SLUSA preemption.

In 1995 Congress enacted the Private Securities Litigation Reform Act ("PSLRA"), which imposed constraints on federal securities class actions due to "perceived abuses of the class-action vehicle in litigation involving nationally traded securities." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 126 S. Ct. 1503, 1510 (2006) ("*Dabit II*"), *rev'g Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25 (2d Cir. 2005) ("*Dabit I*"). Litigants, however, began to avoid application of the PSLRA by bringing class actions based on state law in state court, and Congress enacted SLUSA to prevent such circumvention. *See Dabit II*, 126 S. Ct. at 1510-12. To dismiss an action under SLUSA, the defendant must show: (1) the action is a "covered class action" under SLUSA; (2) the action is based on state law; and (3) the action is one in which the party alleges "an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security" or alleges that "the defendant used or employed any manipulative or

deceptive device or contrivance in connection with the purchase or sale of a covered security." 15

U.S.C.A. § 77p(b). *See Webster v. N.Y. Life Ins. & Annuity Corp.*, 386 F. Supp. 2d 438, 440

(S.D.N.Y. 2006). For the following reasons, I conclude that SLUSA would not preempt plaintiffs'

claims.

**1.     Covered Class Action**

A "covered class action," as defined by SLUSA, includes a lawsuit in which "damages are

sought on behalf of more than 50 persons or prospective class members, and questions of law or

fact common to those persons or members of the prospective class . . . predominate over any

questions affecting only individual persons or members." 15 U.S.C. § 77p(f)(2)(A). The statute

also states that "[f]or purposes of this paragraph, a corporation, investment company, pension plan,

partnership, or other entity, shall be treated as one person or prospective class member, but only if

the entity is not established for the purpose of participating in the action." 15 U.S.C. § 77p(f)(2)(C).

Thus, if damages are sought on behalf of an entity (perhaps in addition to other persons), and the

entity itself benefits multiple persons, that entity will nonetheless be treated as one person if it was

not established for the purpose of participating in the action. In other words, the beneficiaries of

damages that would accrue to an entity will only be counted towards the 50-person limit under

circumstances where the entity was established to participate in the action.

In the case at bar, an action is brought by the Trustees on behalf a Trust that was assigned

both the claims of former shareholders and the claims of AremisSoft itself. These threshold

questions arise: (1) whether the Trust is seeking damages "on behalf of" more than 50 persons; and

(2) if it is, whether the Trust falls within the entity exception, thereby avoiding a class action

designation for what would otherwise be the claims of more than 50 persons. Defendant maintains

that the Trust was formed for the purpose of participating in the action, as is evidenced by the Trust

Agreement, and therefore is not to be counted as a single entity. *See* Def.'s Mem., at 22. Plaintiffs

counter that the Trust was formed for multiple purposes associated with its origin in a bankruptcy proceeding, only one of which is litigating Trust claims, and that therefore it does not constitute a covered class action. *See* Pl.'s Mem. in Opp'n, at 25-26; LaSala Decl. ¶ 8.

Do these plaintiffs seek damages "on behalf of more than 50 persons," as that phrase is used in SLUSA? Because plaintiffs assert that they are bringing claims solely on behalf of the company, *see* Pl.'s Mem. in Opp'n, at 21 ("Rather than asserting claims on behalf of purchasers of securities who were defrauded. . . ., the claims are asserted on behalf of AremisSoft itself."),[5] and a district court in Massachusetts distinguished corporate claims brought by a bankruptcy trust from the shareholder claims brought by the trust, *see Cape Ann Investors LLC v. Lepone*, 296 F. Supp. 2d 4, 12-13 (D. Mass. 2003), I first assess the significance of bringing "company claims" to the application of SLUSA's definition of a "covered class action." This is a straightforward analysis. The statutory definition speaks not in terms of the types of claims asserted but only whether damages are asserted "on behalf of" more than 50 persons. Here, plaintiffs' complaint states that the action is brought "on behalf of the beneficiaries of the AremisSoft Trust" and that

> any and all claims arising out of the purchase of AremisSoft securities on the open market or otherwise from April 22, 1999 through and including July 27, 2001, and any and all of AremisSoft's claims, were assigned to, and for the benefit of, the AremisSoft Trust. As successor to AremisSoft and assignee of claims from AremisSoft shareholders, and pursuant to the Liquidating Trust Agreement ("LTA"), the AremisSoft Trust is the proper successor to all corporate claims and all claims of its shareholders. Through the Co-Trustees, the AremisSoft Trust serves as a vehicle for the prosecution of all such claims. . . .
>
> The purpose of the Aremissoft Trust is to identify and maximize the recovery and distribution of assets for the benefit of the aggrieved shareholders, who are AremisSoft Trust beneficiaries, including SoftBrands, Inc., as the reorganized

---

[5] While plaintiffs' complaint asserts both investor claims and company claims, *see* Compl. ¶ 9 ("[T]he investor claims are not here preempted"); Compl. ¶ 88 ("AremisSoft and its investors, both as represented by Plaintiffs, suffered substantial harm and damage proximately caused by Lloyds' wrongful conduct."), the shareholder claims appear to be disavowed by plaintiffs in their brief, as quoted *supra* in text.

34

debtor.

Compl. introductory ¶; ¶¶ 5-6. *See also* Trust Agreement, Ex. 10 to Decl. of Marc J. Gottridge, dated Jul. 21, 2006 ("Gottridge Decl."); Ex. C. to LaSala Decl., Art. III, ¶¶ 3.3(a)-(b) (stating that Trust recoveries are to be distributed as follows: first the Trustee is to be paid; second, any debts must be satisfied; third, SoftBrands receives its share; and fourth, "Class Members" receive the remainder). Since damages are sought on behalf of these Trust beneficiaries, and since plaintiffs indicate that the former shareholders number more than 6000 persons, the Trust is clearly seeking damages "on behalf of" more than 50 persons. That SoftBrands, the reorganized debtor, is among these beneficiaries does not change the fact that the number is over 50.

In *Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005), the Ninth Circuit analyzed a bankruptcy trust in a similar manner. The court referred to the defendants' position "that the Trustee's Action is brought 'on behalf of more than 50 persons or prospective class members,' i.e., the beneficiaries of the plan trust. . . ." *Id.* at 1007. While the court went on to disagree with the defendants' position with regard to the entity exception and held that the trust in that case was a single entity, it did not disagree with this approach of looking to the trust beneficiaries to determine whether the action was brought on behalf of more than 50 persons. Presumably the court would not have reached the question whether the entity exception applied if it had not found that the trust beneficiaries numbered more than 50. In *Bordier*, similarly, Judge Pisano noted that the beneficiaries of the Trust (which is the same Trust as in the case at bar) numbered more than 50 persons. *See Bordier*, 452 F. Supp. 2d at 590. The district court in *Cape Ann* came to a different conclusion with regard to the company claims asserted in that action, finding that they were not preempted because their "fundamental character" was corporate. *Cape Ann*, 296 F. Supp. 2d at 12-13. I respectfully disagree with this analysis, however; while the court was correct that a corporate claim is distinct from a shareholder claim, SLUSA's definition of a covered class action

35

does not concern itself with the nature of the claim being advanced but rather with the nature of the persons or entities on whose behalf damages are being sought. The character of the claim might well enter into the analysis at another stage, such as whether a defense of *in pari delicto* applies,[6] but it is not relevant at this stage. Here, since damages are indisputably being sought on behalf of beneficiaries of the Trust numbering more than 50 persons, the Trust is a covered class action unless the entity exception applies.

Next I turn to whether the entity exception applies. In support of their argument that such claims do not constitute a covered class action, plaintiffs point to legislative history of SLUSA indicating that the term "covered class action" "does not cover instances in which a person or entity is duly authorized by law . . . to seek damages on behalf of another person or entity. Thus, a trust in bankruptcy, a guardian, a receiver, and other persons or entities duly authorized by law . . . to seek damages on behalf of another person or entity would not be covered this [sic] provision." Senate Report 105-182, at p. 8 (May 4, 1998) (quoted in Pl.'s Mem. in Opp'n, at 25). This gloss does not resolve the question for the claims of *this* Trust, which is something more than an ordinary bankruptcy trust and is, as we have seen, not seeking damages only on behalf of "another person or entity."

In the case before him, Judge Pisano determined that the exception did not apply to the AremisSoft Corporation Liquidating Trust because the Trust was formed for the "primary purpose" of engaging in litigation, which he found satisfied the statutory language "for the purpose of participating in the action."[7] *See Bordier*, 452 F. Supp. 2d at 582-84. I agree with Judge Pisano,

---

[6] For my analysis of this defense, *see* Part II.C., *infra*.

[7] It is clear that the trust need not be created for the purpose of participating in the *particular* legal action to count as a covered class action – the trust need only be created for the purpose of participating in litigation. *See Cape Ann*, 296 F. Supp. 2d 4, 10 (D. Mass. 2003) ("The Trustee's argument that the Trust is a unitary entity because it was created not to pursue any particular action,

36

who it should be noted presided over the initial class actions against AremisSoft and the genesis of this Trust in the Company's bankruptcy. Various provisions in the Trust Agreement indicate that while the Trust was empowered to accomplish multiple tasks, the chief among these was litigating the Trust claims. *See* Trust Agreement, at 1 ("The Trust is organized for the primary purpose of Liquidating the Trust Assets. . . ."); Trust Agreement, at 3 ("WHEREAS, on July 1, 2002, the United States District Court for the District of New Jersey ordered the confirmation of the Plan, providing, among other things, for the establishment of a trust which will hold and prosecute the AremisSoft Causes of Action and the Class Claims. . . ."); Trust Agreement, Art. I, § 1.3 "Purpose of Trust" ("The Trust is organized for the primary purpose of litigating the Trust Claims, distributing the proceeds of the Trust Claims and the Proceed Assets to the Class Members and liquidating its assets for the benefit of the Class Members. . . ."). Because I conclude that the Trust was formed for the primary purpose of engaging in litigation, the entity exception does not apply.

Plaintiffs seek support for their position in *Smith*, where the court held that a bankruptcy estate was not a covered class action. However, in that case, the governing document setting forth the scope of the trustee's powers stated that it would "act as the Estates' representative for *all purposes*," which included managing assets and winding up the estates. *Smith*, 421 F.3d at 1008 (emphasis in original). In other words, the prevalence of ordinary bankruptcy-related tasks in the mandate of the trust precluded a finding that it was organized for the primary purpose of litigating trust claims. This is not inconsistent with my holding here, because the governing document of that trust was different. The mandate of the Trust in the case at bar more closely resembles that in *Cape Ann*, where the "Nutramax Litigation Trust," to which were assigned both the claims of an investors' syndicate and the claims of the failed company NutraMax, was created by the

but all 'such actions as necessary to recover on behalf of beneficiaries,' makes no sense conceptually or legally.").

37

bankruptcy court during the company's Chapter 11 bankruptcy proceeding as a vehicle for pursuing any potentially recoverable assets. *See Cape Ann*, 296 F. Supp. 2d at 8. The district court found that the trust agreement, whose primary purpose was described as "prosecuting the Causes of Action contributed to it . . . and distributing to the Class 6 Beneficiaries [the Electing Shareholders] the assets of the Trust remaining after payment of all claims against or assumed by the Trust," indicated that the Trust was organized for the "primary purpose" of litigation. *See id.* at 10. The court therefore declined to find that the Trust was a unitary entity under the statutory exception and held that it was a covered class action. While this Court believes that the district court in *Cape Ann* should not have excluded the company claims from its analysis of trust claims, I am persuaded by the court's reasoning concerning SLUSA's entity exception. The origin of that trust, and the language of its governing document, are similar to those in the case at bar, and thus the *Cape Ann* court's reasoning supports my interpretation of the statutory language. The AremisSoft Corporation Liquidating Trust is not a single entity within the meaning of SLUSA.

For these reasons, plaintiffs' claims constitute a "covered class action."

## 2. Based on "State Law"

Plaintiffs' tort claims are allegedly brought under Delaware or New Jersey law. *See* Pl.'s Mem. in Opp'n, at 28; Compl. ¶ 85. In Part II.A.3.b., *supra*, I concluded that, applying New York choice of law analysis, the law of Switzerland governs this action. However, SLUSA requires only that the action "purports to be based on state law," *Webster*, 386 F. Supp. 2d at 440, and plaintiffs at bar allege that state law applies. Thus the issue of what law actually applies (and whether Swiss law counts as "state" law for SLUSA purposes) need not be reached for my consideration of SLUSA's applicability to Counts I-IV, as this SLUSA requirement is otherwise satisfied.

However, I must consider that question for purposes of analyzing Count V, which explicitly invokes Swiss law. This is a question on which there is at present no authority. In *Kingdom 5-KR-41, Ltd. v. Star Cruises PLC*, No. 01 Civ. 2946, No. 01 Civ. 7670, 2004 WL 444554, at \*3 n.8 (S.D.N.Y. March 10, 2004), the court noted that the parties did not dispute the proposition "that foreign law is 'state law' for purposes of SLUSA." I agree with plaintiffs that the parties' mutual agreement in another case does not amount to authority on the question. *See* Pl.'s Mem. in Opp'n, at 25 n.14. However, SLUSA was intended by Congress to "completely pre-empt" the field. *Felton v. Morgan Stanley Dean Witter*, 429 F. Supp. 2d 684, 693 (S.D.N.Y. 2006). It was created to close a loophole that had been exploited by class action plaintiffs in the PSLRA, and was intended to do this "by making federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities and by mandating that such class actions be governed exclusively by federal law." *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 108 (2d Cir. 2001). Congress's intention of making federal court the "exclusive venue" for class actions falling within its purview would be frustrated if actions that would otherwise be preempted if brought under state law were permitted to proceed in state court by virtue of being brought under foreign law. I therefore treat Swiss law as state law for purposes of SLUSA.

## 3.    SLUSA's Substantive Reach

After showing that plaintiffs' lawsuit is a "covered class action" based on "state law," defendant must still demonstrate that the substance of plaintiffs' claims falls within SLUSA's preemption. SLUSA only preempts actions in which a plaintiff alleges "an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security" or alleges "that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security." 15 U.S.C. § 77p(b). It is not disputed that this case concerns a "covered security." Only the first of the two substantive provisions is at

39

issue. Plaintiffs argue that their allegations do not fall within SLUSA's substantive reach because they never alleged that the *defendant Lloyds* ever made a misstatement or omission with respect to securities – rather, the misrepresentations were made by others. *See* Pl.'s Mem. in Opp'n, at 20-21. Defendant responds that all that is required for preemption is that the complaint contain allegations of misrepresentations concerning securities, even if these were made by Kyprianou and his co-conspirators rather than by Lloyds. *See* Def.'s Reply Mem., at 11. Defendant also contends that the Confirmation Letter was a misstatement by Lloyds "in connection with" the purchase of sale of securities. *See* Def.'s Mem. at 23-24; Def.'s Reply Mem., at 12.

### a.    *SLUSA Analysis in this Circuit*

Plaintiffs are correct that the conduct of defendant is still central to SLUSA analysis and that the mere allegation of misrepresentations somewhere in the complaint is not sufficient for SLUSA preemption. The Supreme Court's pronouncements that SLUSA should be interpreted broadly, relied on by the Bank, do not dislodge the relevance of defendant's conduct to the analysis. In *Dabit II* the Court stated, "[T]he identity of the plaintiffs does not determine whether the complaint alleges fraud in connection with the purchase or sale of securities. The misconduct of which respondent complains here – fraudulent manipulation of stock prices – unquestionably qualifies as fraud 'in connection with the purchase or sale' of securities. . . ." *Dabit II*, 126 S. Ct. at 1515. The Court never indicated that the statute is so broad as to cut off any claim where the plaintiff happens to reference a misrepresentation in the complaint, regardless of whether it was central to the "misconduct of which respondent complains" on the part of the defendant in the action. In other words, while plaintiff's identity is not a critical component of SLUSA analysis, defendant's conduct is. *See also Paru v. Mut. of Am. Life Ins. Co.*, No. 04 Civ. 6907, 2006 WL 1292828 (S.D.N.Y. May 11, 2006) (claim of breach of fiduciary duty due to company's failure to prevent short-term trading in and out of mutual fund that allegedly harmed fund's long-term

40

investors not preempted by SLUSA because it did not involve allegations of fraud by defendant).

In this Circuit, in order for a claim to be preempted by SLUSA, the *claim* must sound in fraud. *See Xpedior Creditor Trust v. Credit Suisse First Boston (USA), Inc.*, 341 F. Supp. 2d 258, 269 (S.D.N.Y. 2004) (discussing this requirement and stating that "[a] claim sounds in fraud when, although not an essential element of the claim, the plaintiff alleges fraud as an integral part of the conduct giving rise to the claim."). *See also Breakaway Solutions, Inc. v. Morgan Stanley & Co. Inc.*, No. Civ. A 19522, 2004 WL 1949300, at *8 (Del. Ch. Ct. 2004) (breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, unjust enrichment, and indemnification claims not preempted by SLUSA where factual allegations concerning allocation of public offering shares did not sound in fraud). In *Xpedior*, Judge Scheindlin articulated a test that captures this requirement of a connection between the misrepresentations or omissions alleged in the complaint and the claim or claims being advanced. She observed, "Each of these courts applied what I will call the 'necessary component' test, wherein a court must determine whether the state law claim relies on misstatements or omissions as a 'necessary component' of the claim. In this context, 'necessary component' encompasses both technical elements of a claim as well as factual allegations intrinsic to the claim as alleged." *Xpedior*, 341 F. Supp. 2d at 266. This test is applied to the substance, rather than the face, of plaintiff's claim. *Id.* at 268 ("[T]he real question was whether the claim was based on fraudulent conduct, regardless of the appearance of the word 'fraud' or 'misrepresentation.'"). Under the necessary component test, "a complaint is preempted under SLUSA only when it asserts (1) an explicit claim of fraud (*e.g.*, common law fraud, negligent misrepresentations, or fraudulent inducement), or (2) other garden-variety state law claims that 'sound in fraud.'" *Id.* at 266. Judge Scheindlin found that none of plaintiff's claims – breach of contract, breach of the implied covenants of good faith and fair dealing, breach of fiduciary duty, or unjust enrichment – required misrepresentations or omissions as a necessary

element, none of them sounded in fraud, and thus none were preempted by SLUSA. *Id.* at 269; *cf. In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 443 (S.D.N.Y. 2001) (Marrero, J.) (plaintiff's claims for fraud, negligence, and negligent misrepresentation were "grounded on" alleged misstatements and therefore barred by SLUSA).

The test articulated in *Xpedior* is a sensible way of identifying the types of claims SLUSA was intended to preempt. If merely making allegations of fraud somewhere in the complaint were sufficient to bring the case within the reach of SLUSA, a class action complaint for commission of an environmental tort, that also alleged that the company fraudulently altered its books and thereby deceived shareholders, would be preempted, even if the claim against the defendant had nothing to do with securities fraud. Nevertheless, defendant is correct that the misrepresentation or omission at issue need not in all instances be *made by defendant* for SLUSA to preempt the claim. In the case of an aiding or abetting claim, where the underlying conduct that was aided or abetted sounds in fraud, it might be sufficient for the misrepresentation or omission at issue to have been made by the person allegedly aided and abetted by defendant. This was also Judge Pisano's conclusion, when, after framing the question before him as "whether SLUSA preempts state law aiding and abetting claims, where a third party, as opposed to the defendant, purportedly made actionable misrepresentations or omissions," he answered it in the affirmative. *Bordier*, 452 F. Supp. 2d at 585.

In addition to requiring that the claim against defendant sound in fraud, SLUSA also requires that the misstatements or omissions alleged by plaintiffs be "in connection with the purchase or sale of securities." 15 U.S.C. § 77p(b)(1). With respect to the "in connection with" requirement, the Supreme Court stated in *Dabit II*, "[I]t is enough that the fraud 'coincide' with a securities transaction – whether by the plaintiff or by someone else. The requisite showing, in other words, is 'deception in connection with the purchase or sale of any security. . . .'" *Dabit II*,

42

126 S. Ct. at 1513 (quotation and citation omitted). *See Winne*, 315 F. Supp. 2d at 412 ("in connection with" requirement met because allegedly fraudulent fee charged by brokerage firm was intrinsic component of the security and affected its underlying value); *Korsinsky v. Salomon Smith Barney Inc.*, No. 01 Civ. 6085, 2002 WL 27775 (S.D.N.Y. Jan. 10, 2002) (positive recommendations on AT&T stock issued by research analysts at Salomon Smith Barney, made despite knowledge of AT&T's financial problems in order to boost Salomon's investment banking business, were "in connection with" purchase or sale of securities).

Where the alleged conduct giving rise to the claim is too far removed from a securities transaction, the "in connection with" requirement is not met. *See Norman v. Salomon Smith Barney, Inc.*, No. 04 Civ. 4391, 350 F. Supp. 2d 382 (S.D.N.Y. June 9, 2004) (failure by defendant brokerage firm to reveal conflict of interests tainting its research analysts' recommendations, where plaintiffs never saw the analysts' reports with the alleged misrepresentations or relied on them in any way, was not claim falling within SLUSA's purview); *Spielman v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 01 Civ. 3013, 2001 WL 1182927 (S.D.N.Y. Oct. 9, 2001), *appeal dismissed*, 332 F.3d 116 (2d Cir. 2003) (while transaction fees charged by Merrill Lynch affected the cost of trading, they were "not sufficiently connected to the underlying securities to meet the requirement that the misrepresentation about those fees be 'in connection with' the purchase or sale of covered securities"); *Gavin v. AT&T Corp.*, 464 F.3d 634 (7th Cir. 2006) (Posner, J.) (where alleged misconduct was due to letter's failure to inform shareholders of complete array of options following company's merger, fraudulent conduct cited in complaint was unconnected to securities); *Strigliabotti v. Franklin Resources, Inc.*, 398 F. Supp. 2d 1094, 1100 (N.D. Cal. 2005) ("While the fraud in question need not relate to the investment value of the securities themselves, it must have more than some tangential relation to the securities transaction."); *French v. First Union Sec*, Inc., 209 F. Supp. 2d 818, 824 (M.D. Tenn. 2002)

43

(failure by broker to make statements regarding his qualifications or investment strategy not preempted by SLUSA) ("[I]n order for a breach to be 'in connection with' securities sales, the breach of the fiduciary duty must do more than simply implicate securities. Rather, there must be a showing of a nexus between the fraud and a securities transaction.").

These requirements that must be satisfied for SLUSA preemption to apply are, under the law of this Circuit, applied to each claim in the complaint rather than to the whole action. In *Bordier*, Judge Pisano disposed of the Swiss law claims in his SLUSA analysis by citing a Third Circuit case holding that SLUSA preempts entire actions and not claims. *See Bordier*, 452 F. Supp. 2d at 577 n.1 (citing *Rowinski v. Salomon Smith Barney Inc.*, 398 F.3d 294, 298 (3d Cir. 2005)). That is not the law of this Circuit. In *Dabit I*, the Second Circuit dismissed one of the plaintiff's claims as preempted by SLUSA but not the other. The court noted that defendant's interpretation that maintenance of an entire action is prohibited so long as a complaint included some allegations triggering preemption would lead to the result that "SLUSA would effectively preempt any state law claim conjoined in a given case with a securities fraud case, whatever its nature." *Dabit I*, 395 F.3d at 47. The court declined to adopt that reading because "the historic police powers of the states are not preempted unless it was Congress's 'clear and manifest purpose' to do so." *Id.* When the Supreme Court overruled *Dabit I*, it was on other grounds, and thus I take the Second Circuit's claim/action analysis to be the law of the Circuit.[8]

---

[8] Additionally, the Second Circuit expressly decided the question in *Gray v. Seabord Sec., Inc.*, 126 Fed. Appx. 14, 16, at *1 (2d Cir. 2005) (rejecting argument that preemptive provision of SLUSA requires dismissal of entire action that includes one or more preempted claims). While *Gray* is an unpublished summary order, and Local Rule § 0.23 prevented the parties from citing this case in their briefs, I agree with Judge Lynch in finding "the opinion of a distinguished Second Circuit panel highly persuasive, at least as worthy of citation as law review student notes, and eminently predictive of how the Court would in fact decide a future case such as this one." *Harris v. United Fed'n Teachers, New York City Local 2*, 02 Civ. 3257, 2002 WL 1880391, at *1 n.2 (S.D.N.Y. Aug. 14, 2002). Local Rule § 0.23 has since been superseded by new Fed. R. App. P.32.1, which prohibits federal courts from disallowing the citation of unpublished opinions, but

44

The Supreme Court in *Dabit II* did not express a view as to the Second Circuit's position on the action/claim analysis. Lloyds relies upon a recent opinion from the District of New Jersey in which District Judge William J. Martini considered the question at some length and concluded that the plain language of the statute and the Supreme Court's opinion in *Dabit II* supported the interpretation that SLUSA preempts entire actions and not merely claims. *See In Re Lord Abbett Mut. Funds Fee Litig.*, No. 04 Civ. 0559, 2006 WL 3483946 (D.N.J. Dec. 4, 2006). In Judge Martini's view, the Supreme Court "weakened, if not undercut entirely, the Second Circuit's reading in *Dabit I* that SLUSA only preempts claims and not entire actions," because the Court stated that the presumption against preemption of state law claims did not possess the same force in the SLUSA context. *Id.* at *6. Since the Second Circuit had relied upon that presumption in its claim/action analysis, Judge Martini reasoned, the Supreme Court effectively eviscerated the basis for the Second Circuit's separate consideration of claims. I am not entirely in agreement. The Court in *Dabit II* stated:

> In concluding that SLUSA pre-empts state-law holder class-action *claims* of the kind alleged in Dabit's complaint, we do not lose sight of the general presum[ption] that Congress does not cavalierly pre-empt state-law *causes of action*. But that presumption carries less force here than in other contexts because SLUSA does not actually pre-empt any state *cause of action*. It simply denies plaintiffs the right to use the class action device to vindicate certain *claims*.

*Dabit II*, 126 S. Ct. at 1514 (emphases added). Thus the Court's own explanation of SLUSA's operation describes the statute as preempting claims and not actions. While I read the Supreme Court's dicta in *Dabit II* differently than does Judge Martini, *Dabit II* falls short of a ruling by the Supreme Court that SLUSA preempts claims rather than actions or vice versa.

Plaintiffs, for their part, bring to my attention a recent case, *Jones v. Block*, 127 S. Ct. 910 (2007), ostensibly shedding light on this question. In *Jones* the Supreme Court held that the

the new Rule 32.1 only applies to decisions issued "on or after" January 1, 2007.

Prisoner Litigation Reform Act ("PLRA") preempts claims and not entire actions. *See Jones*, 127
S. Ct. at 923-24 (Supreme Court reasoned that the PLRA, which provides that "no action shall be
brought" unless administrative procedures have been exhausted, only requires dismissal of claims
that have not been properly exhausted – not dismissal of an entire action if a claim or claims within
it have not been properly exhausted). Defendant argues that the PLRA is a different statutory
scheme altogether and the Court's analysis of it may not be applied wholesale to SLUSA. On the
other hand, plaintiffs point to several general principles outlined by the Court that signal
disapproval of dismissing entire actions as a general rule: "This statutory phrasing – 'no action
shall be brought' – is boilerplate language. . . . More generally, statutory references to an 'action'
have not typically been read to mean that every claim included in the action must meet the
pertinent requirement before the 'action' may proceed." *Id.* at 924. Finally, plaintiffs point to
language addressing principles for dismissal of the complaint: "As a general matter, if a complaint
contains both good and bad claims . . . [o]nly the bad claims are dismissed; the complaint as a
whole is not. If Congress meant to depart from this norm, we would expect some indication of that,
and we find none" (quotation and citations omitted). *Id.* While this language about "norms" for
interpreting statutory language concerning dismissal of a complaint reinforces my interpretation of
SLUSA, I still cannot say that such language definitively decides the claim/action question within
the SLUSA context.

In the absence of clear indication from the Supreme Court, I am bound by existing Second
Circuit law, until such time as the Second Circuit should change its mind or the Supreme Court
decide the question squarely. Accordingly, I consider plaintiffs' claims separately. Only those
that are supported by allegations that fall within the scope of SLUSA's preemption are preempted.

### *b. Application of SLUSA's Requirements to Plaintiffs' Claims*

Count I is for aiding and abetting a breach of fiduciary duty. The complaint describes the fraudulent scheme by Kyprianou to drive up the price of AremisSoft shares, cash in his shares, conceal the proceeds of these illegal sales by using shell entities to mislead the public into thinking that the stock sales were arm's length sales by ordinary investors, and then shuffle the funds between various bank accounts so that they ultimately arrived in his pocket. Compl. ¶¶ 18, 19, 48. Lloyds's alleged role with respect to this scheme was only in conjunction with the last step in which proceeds of the fraud were shuffled between banks. *See id.* ¶ 48. It is alleged that Lloyds "knowingly participat[ed] in Kyprianou's scheme to conceal his fraud by engaging in covert activities to frustrate the tracing of Kyprianou's illegal proceeds. . . . Lloyds further aided and abetted Kyprianou's breaches of fiduciary duties by knowingly permitting tens of millions of dollars to be funneled through the bank's accounts. . . ." *Id.* ¶ 86. It is also alleged that Lloyds' creation of the false Confirmation Letter further aided and abetted Kyprianou's breaches of fiduciary duty. *Id.* ¶ 87. Here, the underlying conduct by Kyprianou that Lloyds allegedly aided and abetted does sound in fraud as fraud is an integral part of it, and thus the aiding and abetting claim against Lloyds also sounds in fraud.

However, Kyprianou's conduct that is linked to Lloyds' in the complaint must still "coincide" with a securities transaction, and I hold that it does not. As in the related case against UBS, the money was already ill-gotten by the time it reached Lloyds. *See id.* ¶¶ 54-60. Lloyds received the tainted proceeds of Kyprianou's securities fraud from Bordier and Dominick, two Swiss private banks which had assisted in the conversion of shares to cash. It is alleged that Lloyds knew the funds were tainted and nonetheless assisted the Cypriots by holding the funds for a period of time and then transferring them to other accounts when directed. *Id.* ¶¶ 54, 55. By the time Lloyds got the money, the fraud with respect to those investors to whom those shares had been sold was already complete. If Lloyds were alleged to have facilitated the sale of the

47

AremisSoft shares, then conceivably the bank could be tied to the portion of the swindlers' scheme that involved securities fraud, as the sale of shares by the shell entities was a crucial last step, without which it would not have been complete. But the facts alleged make clear that all the money handled by Lloyds came from other banks after the shares had been sold.

Kyprianou and Poyiadjis did many bad acts; but the Bank is only implicated in some of them, and these acts do not constitute securities fraud of the type covered by SLUSA. Because the underlying conduct of Poyiadjis and Kyprianou in which the Bank is implicated here was too far removed from a securities transaction to be said to have "coincided" with it, Count I of the complaint is not preempted by SLUSA.[9]

Count II of the complaint alleges that Lloyds aided and abetted Kyprianou's fraud. For the reasons stated above, I hold that because the conduct alleged to have been aided and abetted by Lloyds is too far removed from a securities transaction to be said to "coincide" with it, this claim also is not preempted by SLUSA.

Count III of the complaint alleges fraud on the part of Lloyds. The allegations supporting this claim are the following:

> The issuance by Lloyds of the misleading Confirmation Letter, which upon information and belief, falsely stated that monies were blocked and had been since December 29, 2000, and which falsely suggested that AremisSoft had an account at Lloyds when it did not, enabled AremisSoft to include false and misleading

---

[9] I note that nothing in my holding is intended to suggest that SLUSA could not preempt a claim for aiding and abetting a breach of fiduciary duty, so long as the defendant's conduct is alleged to be in furtherance of a misrepresentation or omission within the meaning of SLUSA. *See In re NYSE Specialists Sec. Litig.*, 405 F. Supp. 2d 281, 308 (S.D.N.Y. 2005) (count alleging breach of fiduciary duty and/or aiding and abetting breach of fiduciary duty preempted by SLUSA because "the Complaint's allegations demonstrate that these claims are based on fraudulent conduct"); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (dismissing count for aiding and abetting breach of fiduciary duty as preempted by SLUSA); *Prof'l Mgmt Assocs., Inc. Employees' Profit Sharing Plan v. KPMG, LLP*, 335 F.3d 800, 803 (8th Cir. 2003) (claims against accounting firm preempted by SLUSA where complaint alleged, *inter alia*, that the firm aided and abetted company's breaches of fiduciary duty).

material information in AremisSoft's publicly filed financial statements and further delayed for months discovery of the massive AremisSoft fraud. Further, this false and misleading information was relied on by the Company and by the auditors of AremisSoft in auditing the financial statements for the Company and in preparing their opinion thereon.

The Company, other than the co-conspirators themselves, did not know that the subsequently published audit opinion was thereby tainted. Investors continued to buy millions of shares of AremisSoft stock not knowing that its financial results and financial statements were false and misleading.

Compl. ¶¶ 66, 67. These allegations, which allege a misrepresentation on the part of defendant, clearly sound in fraud. However, they do not coincide with a securities transaction. The cases where defendant's acts coincided with a securities transaction involved securities in a direct sense, even if the purpose of the fraud was only to increase defendant's business. In *Rowinski*, for instance, the Third Circuit found that a scheme by Salomon Smith Barney to systematically misrepresent the value of securities to the investing public "in order to curry favor with investment banking clients and reap hundreds of millions of dollars in investment banking fees" coincided with a securities transaction because "[f]or this purported scheme to work, investors must purchase the misrepresented securities." *Rowinski*, 398 F.3d at 302. In other words, even though the defendant's alleged motivation was to procure fees for itself (rather than, say, to drive up the stock price and profit through sales of stock), the scheme still was meant to induce investors to buy stock. *Compare Winne*, 315 F. Supp. 2d at 413 ("Essentially, plaintiff alleges that defendants induced him to purchase the Variable Annuity by failing to disclose the penalty withdrawal fee and the effect it has on the underlying value of the policy."), *with Strigliabotti*, 398 F. Supp. 2d at 1101 (plaintiffs alleged that defendants charged excessive fees in relation to advisory services provided to Funds, but "they do not allege that they were induced into purchasing or selling any securities, or that defendants' actions led them to hold on to their securities longer than they would have otherwise."). Here it is not alleged that Lloyds possessed the motive of inducing the purchase of

AremisSoft securities. The most that is alleged is that Lloyds issued the Letter "knowing that it would have a material impact on the market value of AremisSoft." Compl. ¶ 62.

In *Rowinski* the Third Circuit also found that SLUSA's "in connection with" requirement was met in part because the alleged misrepresentations by Salomon had been made "in a medium upon which a reasonable investor would rely, namely, investment research reports," *Rowinski*, 398 F.3d at 302 (internal quotation marks omitted). In the case at bar, the alleged misrepresentation of the Confirmation Letter was not made in a medium upon which a reasonable investor would rely, as it was made not directly to the investing public but rather to the Company. Even if the Letter provided source material for information prepared for the public in public filings, this is one step removed from the direct dissemination of misrepresentations to the public. The allegations of the complaint are at bottom allegations about a fraud on the Company – they are that the Confirmation Letter deceived the *Company*, which in turn caused the Company to unwittingly deceive the investing public. It is not alleged that the misrepresentation was made in order to induce investors to purchase or retain AremisSoft stock.

Defendant argues that because trading of AremisSoft shares was occurring during the time that the Letter was written and had its effect on the Company's audit, *Dabit II*'s "coincide" test is satisfied. Def.'s Reply Mem., at 12. I disagree. Even if the alleged fraud on the Company kept the stock price artificially inflated, which might well have affected the value of the Company's outstanding shares, that would merely have been an incidental effect of the fraud. *Cf. Gavin*, 464 F.3d at 639 ("Of course there is a literal sense in which anything that happens that would not have happened but for some prior event is connected to that event. In that sense the fraud of which the plaintiff complains is connected to the merger, without which there would not have been such a fraud against the plaintiff and her class. But in the same sense the fraud is connected to the Big Bang, without which there would never have been a MediaOne or even an AT&T."). The

allegations concerning defendant's conduct with respect to the Confirmation Letter are simply too far removed from a securities transaction to satisfy SLUSA's "in connection with" requirement. For this reason, Count III is not preempted.

Count IV is for negligent misrepresentation. Because the allegations concerning the Confirmation Letter are integral to this claim, I conclude that while the claim does sound in fraud, it does not coincide with a securities transaction for the reasons stated above.

Count V alleges a Swiss tort for violations of Swiss statutory provisions. As discussed *supra* in Part I.A., plaintiffs allege that defendant violated Swiss laws requiring banks to follow certain procedures that involve making inquiries and obtaining information from clients about their accounts. The complaint alleges that provisions of the Swiss laws and codes were violated by the following acts and omissions:

> Authorized representatives and/or employees of Lloyds failed to exercise the degree of diligence required by the circumstances to verify the identity of the beneficial owner of the assets deposited in the accounts at the bank and to ascertain the origin of the funds in the accounts. After learning that Kyprianou used conspirators to sell more than 10 million shares of stock in 2000 – and even after the publication of widespread media reports beginning in May 2001 concerning fraud at AremisSoft – authorized representatives and/or employees of Lloyds took no action to determine the source of the funds in the accounts maintained by Kyprianou, to notify the Reporting Office for Money Laundering, to freeze the funds in the accounts, or to otherwise prevent Kyprianou's money laundering.

Compl. ¶ 111. These alleged breaches of certain investigatory and reporting requirements are something wholly apart from allegations sounding in fraud. The allegations concern *lapses* – failures on the part of Lloyds to exercise due diligence. While the Confirmation Letter is also mentioned in this count, it is mentioned in the context of plaintiffs' elaboration on the effect of Lloyds' activity, and is not so central or "integral" to this claim as to satisfy the test for whether a claim "sounds in fraud." *See* Compl. ¶ 112 ("Further, Lloyds' false and misleading Confirmation Letter caused the Company's public filing to include false financial statements that misrepresented

51

the Company's cash position. The provision of the false and misleading confirm both delayed discovery of the fraud, resulting in further investor losses, and deepened the Company's own insolvency."). Even if allegations concerning the Confirmation Letter were sufficient to cause this claim to sound in fraud, defendant's conduct did not coincide with a securities transaction for the reasons stated above.

Consequently, all of plaintiffs' claims survive SLUSA preemption.

## C.  The Doctrine of *In Pari Delicto* and the *Wagoner* Rule

Under my analysis, plaintiffs' claims, which are the claims of AremisSoft, survive SLUSA preemption. Whether the Trustees, who are empowered by the Trust Agreement to bring the company claims, *may* in fact bring them, or whether these claims are barred under another theory, is a separate question unrelated to SLUSA. The Bank asserts defenses based on the doctrine of *in pari delicto* and a rule that has come to be known as the *Wagoner* rule, after *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114 (2d Cir. 1991).

Literally meaning "in equal fault," the common law defense of *in pari delicto* bars a plaintiff from recovering a loss caused in part by his own wrongful conduct.[10] *Ucar Int'l Inc. et al. v. Union Carbide Corp.*, No. 00 Civ. 1338, 2004 WL 137073, at *10 (S.D.N.Y. Jan 26, 2004). A plaintiff is prohibited from bringing a claim where it was an "active, voluntary participant in the unlawful activity that is the subject of the suit." *Granite Partners, L.P. v. Bear, Stearns & Co., Inc.*, 17 F. Supp. 2d 275, 308 (S.D.N.Y. 1998) (quotation marks omitted). The principles grounding the defense are twofold: (1) courts should not provide a forum to resolve disputes between wrongdoers; and (2) precluding relief to an admitted wrongdoer will have a deterrent effect on illegal conduct.

---

[10] It is derived from the Latin maxim *in pari delicto potior est conditio defendentis*, meaning that "in the case of equal or mutual fault . . . the position of the [defending] party is the better one." *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 306 (1985).

52

*Id.* Defendant asserts that plaintiffs are barred from bringing their claims because AremisSoft was a wrongdoer, as is evidenced by the Company's admission of complicity in the fraud. *See* Def.'s Reply Mem. at 12-13. Plaintiffs counter that the SEC Order contains an explicit provision stating that AremisSoft submitted its Offer of Settlement "[s]olely for the purpose of these proceedings, and any other proceedings brought by or on behalf of the Commission or to which the Commission is a party, without admitting or denying the findings set forth below. . . ." *In re AremisSoft* (Jul. 31, 2002).[11] Moreover, plaintiffs contend that even though Poyiadjis and Kyprianou were agents of AremisSoft, their wrongdoing should not be imputed to the Company because they were acting with interests entirely adverse to those of the Company. *See In re CBI Holding Co., Inc.*, 311 B.R. 350, 369 (S.D.N.Y. 2004) ("adverse interest" exception to the normal principle of imputation applies when the agent has "totally abandoned his principal's interests and [is] acting entirely for his own or another's purposes") (internal quotation marks and citation omitted).

Under the *Wagoner* rule, "where a bankrupt corporation has joined with a third party in defrauding its creditors, the trustee cannot recover against the third party for the damage to the creditors." *Wagoner*, 944 F.2d at 118. This is because "[a] claim against a third party for defrauding a corporation with the cooperation of management accrues to creditors, not to the guilty corporation." *Id.* at 120. "The rationale for the *Wagoner* rule is the fundamental principle of agency that the misconduct of managers within the scope of their employment will normally be imputed to the corporation. Because management's misconduct is imputed to the corporation, and because a trustee stands in the shoes of the corporation, the *Wagoner* rule bars a trustee from suing to recover for a wrong that he himself essentially took part in." *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000) (citations omitted). Like the *in pari delicto* doctrine, therefore, the

---

[11] This order is attached as Ex. 1 to Decl. of Marc. J. Gottridge, in further Supp. of Def.'s Mot., dated October 18, 2006 ("Gottridge Reply Decl.").

*Wagoner* doctrine relies on principles of agency law in determining whether management's misconduct is to be imputed to the bankrupt corporation. *See In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 609 n.45 (S.D.N.Y. 2007) (the two doctrines are "quite similar," though the *Wagoner* doctrine is a standing rule, and *in pari delicto* is a defense). Thus under New York law, if the "adverse interest" exception to the normal rule of imputation applies (and no exception to that exception applies), the trustee, standing in the shoes of the bankrupt corporation, has standing to bring the claim against the third party.

The intricacies of New York (or, for that matter, Delaware) agency law are not, however, at issue in this case. Both *in pari delicto* and the *Wagoner* rule involve applications of substantive state law. *See Granite Partners*, 17 F. Supp. 2d at 306 n.16 (New York law determines applicability of *in pari delicto* defense because its substantive law applies to the claim); *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d at 594, 595 ("Whether a claim belongs to the debtor or to its creditor is a function of the substantive law governing each claim" and Wagoner's doctrine concerning complicit third parties is a question of New York law). *See also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 156 (2d Cir. 2003) (Texas law properly applied to determine whether plaintiff's claims belong to debtor or its creditors). If Swiss law applies, as I have found that it does, *see supra* Part II.A.3.b., these legal arguments may not be available to defendant. Judge Kaplan came to a similar conclusion about the *Wagoner* doctrine in a case involving North Carolina law: "[T]here is a fundamental problem with the Bank's use of *Wagoner*. The case, to whatever extent it may be relevant to the *in pari delicto* issue, is an application of New York law. The question whether the Parmalat Debtors are chargeable with the fraud allegedly perpetrated by the companies' former management, and thus whether Bondi is subject to a defense of *in pari delicto*, is governed by the law of North Carolina.

*Wagoner* is simply not controlling here." *In re Parmalat Sec. Litig.*, 383 F. Supp. 2d 586, 595 (S.D.N.Y. 2005). As I am not in possession of evidence concerning Swiss law on this question (such as what principles Switzerland's agency law employs to determine whether the conduct of Poyiadjis and Kyprianou are to be imputed to AremisSoft), I decline to consider the applicability of these two doctrines.

## D.    12(b)(6) Failure to State a Claim

I also do not reach defendant's third ground for dismissal in its motion, namely, failure to state a claim upon which relief may be granted. Because I have found that the law of Switzerland applies to plaintiffs' claims, and that the preference for a foreign court's deciding questions of foreign law is a factor in my dismissal on the basis of *forum non conveniens*, it would not be appropriate for the Court to conduct a Rule 12(b)(6) analysis on the basis of Swiss law, particularly where that law is unsettled.

## III. CONCLUSION

For the foregoing reasons, and in the exercise of my discretion, I grant defendant's motion to dismiss on the ground of *forum non conveniens* only, and dismiss the complaint without prejudice to the merits of plaintiffs' claims.[12]

That dismissal is conditioned upon the defendant Lloyds appearing and defending on the merits, without interposing a statute of limitations, an action asserting claims arising out of these facts, by the plaintiff Trustees in the courts of Switzerland, failing which plaintiffs may apply to restore the case to this Court's calendar.

---

[12] Plaintiffs' pending motion for an order requiring defendant to retain and preserve documents, records, and data is also hereby denied as moot. Since this case has been dismissed in favor of the courts Switzerland, any application for the preservation of documents or related relief should be made to the courts of that country.

It is SO ORDERED.

Dated: New York, New York
      August 15, 2007

CHARLES S. HAIGHT, JR.
SENIOR UNITED STATES DISTRICT JUDGE